In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 02-2403 & 02-2470

MCROBERTS SOFTWARE, INC.,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

MEDIA 100, INC.,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99-1577 C M/S—**Larry J. McKinney**, *Chief Judge.*

ARGUED DECEMBER 12, 2002—DECIDED MAY 14, 2003

Before FLAUM, *Chief Judge*, and MANION and ROVNER, *Circuit Judges.*

FLAUM, *Chief Judge.* McRoberts Software, Inc. ("MSI") sued Media 100, Inc. ("Media 100") for copyright infringement, trade secret misappropriation, and breach of contract stemming from a 1995 licensing agreement between the parties for MSI's character generation computer software program. A jury found in favor of MSI on all three claims and awarded substantial damages. Upon motions by both parties for post-trial relief, the district judge: (1) affirmed the jury's finding that Media 100 infringed

MSI's copyright, misappropriated MSI's trade secrets, and breached their contract; (2) upheld the jury's award of damages to MSI for copyright infringement and breach of contract; (3) vacated the jury's award of damages to MSI for trade secret misappropriation, calling it duplicative of the copyright infringement award; and (4) awarded MSI attorneys' fees and prejudgment interest.

Media 100 now appeals the jury's finding of liability for copyright infringement, the jury's damage awards for copyright infringement and breach of contract, and the district court's decision to award MSI attorneys' fees and prejudgment interest. MSI appeals the district court's decision to vacate the jury's damage award for trade secret misappropriation. We reverse the district court's order vacating the trade secret damages award and affirm in all other respects.

## I. Background

In 1992 MSI developed a computer software program for character generation called Comet/CG. Character generation is the process of placing text over video and audio, as when words appear over images in a television ad or credits scroll at the end of a movie. Prior to MSI's inventing its software, character generation required specialized hardware which cost up to $100,000, but MSI's Comet/CG software provided similar character generation capability for users of Apple's Macintosh personal computers at around $1,300. Media 100 (formerly Data Translation, Inc.) manufactured video editing equipment, including the very expensive character generation hardware used by advertising agencies and television production studios. When Media 100 decided to enter the personal computing market it turned to MSI to supply its Comet/CG software for use with its new "Media 100" line of personal video editing board hardware. MSI and Media 100 negotiated

three separate licensing agreements, in 1993, 1995, and 1998. Only portions of the 1995 agreement are relevant to this case.

Initially, Media 100's personal video editing boards functioned only on Macintosh computers through a video card component called a NuBus. Windows computers, in contrast, are compatible only with a video component called a PCI bus. Therefore, until Macintosh retooled its computers in 1995 to accept PCI bus hardware, video editing systems could only function on Macintosh or Windows machines, but not both. The programming language for Macintosh and Windows machines was similarly incompatible, so MSI's Comet/CG source code could only be executed with Macintosh-compatible video editing boards. Early in the partnership between Media 100 and MSI, the Windows versus Macintosh debate remained distant on the horizon, at least in the video and graphic arts world. But it soon became clear that the personal computing market was going the way of Windows. By the time MSI and Media 100 negotiated their 1995 licensing agreement, both companies sensed that a profitable future had something to do with producing Windows-compatible products.

The crux of MSI's copyright infringement claim turns on the meaning of the phrase "Media 100 hardware" in the 1995 licensing agreement. Specifically, the parties dispute whether the license permitted Media 100's use of Comet/CG on only existing Macintosh-compatible systems (and their progeny) or on as-yet-undeveloped Windows-compatible systems. On summary judgment the district court determined that Section 5 of the 1995 licensing agreement defined the scope of Media 100's license to use MSI's Comet/CG software, and that all other intellectual property rights not licensed by the agreement were deemed held exclusively by MSI. Section 5 provided:

> Subject to [Media 100] timely paying all amounts owing hereunder, upon payment of the $75,000 license fee stated in section 3.2 for the CG Option 2.0 license, then [Media 100] shall have a paid-up license to (1) modify the CG Option 2.0 source code; (2) generate executable code versions of CG Option 2.0; (3) distribute executable code versions of CG Option 2.0 when integrated with [Media 100]'s Media 100 hardware and software used for digital video editing, and such versions shall be licensed only for use on such hardware.

> [Media 100] shall provide one source code copy of all revisions it makes to Comet/CG to MSI on magnetic media within thirty (30) days of release, and MSI may incorporate such revisions in its version of Comet/CG.

During negotiations for the 1995 agreement, MSI knew that Media 100 had developed a new video editing board based on the PCI bus architecture. While Media 100's new bus hardware made its products potentially compatible with Windows machines, the bundled video editing software, including Comet/CG, that Media 100 agreed to license from MSI still only operated on Macintosh machines. In 1998 Media 100 decided that it could no longer afford to be outside looking in on the Windows machine market, so it entered an agreement with software development firm Vanteon (formerly Millennium Computer Corp.) to translate the Comet/CG source code from Macintosh to Windows (akin to translating English to Chinese, in the words of MSI owner, Mr. McRoberts). Media 100 gave Vanteon a copy of MSI's confidential Comet/CG source code, without MSI's consent or knowledge, and paid Vanteon nearly $3.2 million to translate the code as quickly as possible. When Vanteon completed the task, Media 100 took the new code, put it into a Windows-compatible video editing system, and began selling it immediately. This new product line was named "Finish" and was essentially the same as the old "Media 100" line, except that Finish

worked on Windows machines and Media 100 worked on Macintosh machines.

Soon after the Finish boards containing the translated Comet/CG code hit the market, MSI complained to Media 100 that it was not licensed to incorporate the Comet/CG software into its Windows-compatible product line, nor was it licensed to use any new version of Comet/CG that operated on PCI bus architecture rather than NuBus. Moreover, MSI demanded that Media 100 give it a copy of the translated Comet/CG code created by Vanteon as required by the licensing agreement. Media 100 refused to give MSI the translated code, but it removed all Finish products containing the translated MSI software from the market, licensed another company's Windows-compatible CG software, and reissued the Finish video boards with the new software.

MSI sued Media 100 in federal district court, claiming: (1) copyright infringement under the Federal Copyright Act based on Media 100's unauthorized creation and distribution of the translated Windows-compatible Comet/CG software, (2) trade secret misappropriation under Indiana's Trade Secret Act based on Media 100's unauthorized disclosure of the confidential Comet/CG source code to Vanteon, and (3) breach of contract under Indiana common law based on Media 100's failure to provide MSI with a copy of its translated Windows-compatible Comet/CG software. The district court denied Media 100's motion for partial summary judgment, finding that MSI's intellectual property claims were not preempted by the terms of the licensing agreement. The court determined that the 1995 license permitted Media 100 to generate and distribute executable code versions of Comet/CG source code that it had modified, but only so long as the modifications to the source code were themselves within the scope of the license. Further, the court determined that the scope of the licensing agreement was ambiguous. Although the

court found that the phrase "when integrated with [Media 100]'s Media 100 hardware and software used for digital editing" delineated the scope of the license, it decided that the phrase may have included only NuBus hardware and Macintosh-compatible systems, as MSI contended, or it may have also included PCI bus hardware and Windows-compatible systems, as Media 100 argued.

MSI and Media 100 took their case to trial, and a jury found in favor of MSI on all three claims, awarding MSI substantial damages. Specifically, the jury awarded MSI damages for copyright infringement in the amount of $1.2 million for actual damages and $900,000 for lost profits; for trade secret misappropriation in the amount of $300,000; and for breach of contract in the amount of $85,000. Media 100 sought post-trial relief on all claims under Rules 50 and 59 of the Federal Rules of Civil Procedure. The court denied Media 100's Rule 50 motion for judgment as a matter of law on the substantive claims and declined to award a new trial under Rule 59 or reduce the jury's damage awards for copyright infringement and breach of contract; however, the court vacated the jury's $300,000 damage award for trade secret misappropriation, calling it duplicative of the copyright infringement award. Additionally, the district court granted MSI's post-trial motion for attorneys' fees ($192,283), costs ($475), and prejudgment interest ($313,061). Media 100 and MSI both appeal from the district court's post-trial orders.

## II.  Discussion

### A.  Copyright Infringement Liability

The jury determined that Media 100 infringed MSI's copyright because Media 100 acted outside the scope of the 1995 licensing agreement when it copied and translated the Comet/CG source code into Windows with Vanteon's

paid assistance, and then distributed the translated version of the Comet/CG software with its Windows-based Finish products. The district court denied Media 100's post-trial motion for judgment as a matter of law on copyright infringement, and we review that decision *de novo*. *Mathur v. Board of Trustees of Southern Illinois University*, 207 F.3d 938, 941 (7th Cir. 2000); *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 629 (7th Cir. 1996). A motion for judgment as a matter of law should be granted only where there can be but one conclusion from the evidence. *Emmel*, 95 F.3d at 636. In reviewing a jury's verdict, we must consider the evidence in the light most favorable to the prevailing party, and only if there is no legally sufficient evidentiary basis to support the verdict will we reverse it. *Id.* at 629. In other words, "we are limited to assessing whether no rational jury could have found for the [prevailing party]." *Emmel*, 95 F.3d at 630. As a reviewing court, we must be particularly careful "to avoid supplanting [our] view of the credibility or the weight of evidence for that . . . of the jury." *Mathur*, 207 F.3d at 941; *see also Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F.3d 587, 595 (7th Cir. 2001).

Giving due deference to the jury's findings, we cannot say as a matter of law that Media 100 did not infringe MSI's copyright in its Comet/CG source code. In ruling on the parties' summary judgment motions prior to trial, the district court held that the licensing agreement between MSI and Media 100 was ambiguous in scope. In particular, the court found that it was unclear whether the license gave Media 100 the right to do what it ultimately did, which was translate the Comet/CG source code into Windows and then distribute the translated software in new Media 100 Windows hardware, without first obtaining permission from MSI. The parties submitted this question of interpretation to the jury, and the jury resolved the ambiguity in favor of MSI.

Media 100 now argues on appeal that it is entitled to judgment as a matter of law because the plain language of the 1995 agreement and the evidence introduced at trial established conclusively that Media 100 did not exceed the scope of its license. Media 100 claims that the ambiguity in the license agreement over the meaning of the term "Media 100 hardware" can only be resolved in its favor because MSI's founder and president, Mr. McRoberts, testified at trial that he knew at the time he negotiated the 1995 agreement that Media 100 would want to modify the Comet/CG source code to work on Windows hardware. Since Mr. McRoberts knew this, Media 100 argues, he of course meant for the phrase "Media 100 hardware" in the 1995 agreement to include both existing Macintosh hardware and the not-yet-developed Windows hardware. Since the jury was told that Media 100's liability for copyright infringement turned on whether the phrase "Media 100 hardware" included Windows hardware, and since Mr. McRoberts testified that he knew Media 100 might want to develop and sell Windows hardware at some time in the future, Media 100 argues that the jury could only have concluded that Media 100 operated within the scope of the license when it translated and distributed a Windows version of Comet/CG without MSI's permission.

In contrast, MSI argues that Mr. McRoberts intentionally neglected to define "Media 100 hardware" in the 1995 license as including Windows hardware because (1) neither MSI nor Media 100 had any Windows-compatible products in existence at that time, so it was unnecessary to affirmatively include or exclude them from the license, and (2) MSI wanted to preserve its right to participate in the development of character generation software for Windows if and when Media 100 decided to make an investment in the technology on its end. MSI supported its interpretation of the license with several pieces of

evidence, including: (1) the testimony of Mr. McRoberts regarding his intentions at the time he made the agreement with Media 100, (2) the testimony of Media 100 executives regarding their understanding of the scope of the license, none of whom could definitively say that they knew Mr. McRoberts meant to include the use of undeveloped Windows-compatible software in the terms of the 1995 license, (3) copies of MSI's past software development contracts and Comet/CG licensing agreements with Media 100 and other hardware companies, and (4) the district court's instruction to the jury that the meaning of the term "Media 100 hardware" in the 1995 agreement was indisputably ambiguous. The evidence also showed that Media 100 paid about the same amount of money for its 1995 license as it had for earlier licenses of Comet/CG, even though, according to Media 100, the 1995 license was immensely greater in scope because it included the right to modify, create, and distribute Comet/CG in Windows products as well as Macintosh products.

Given all of this evidence, it was reasonable for the jury to conclude that the 1995 license limited Media 100's use of the Comet/CG software to Macintosh hardware only, and that Media 100 exceeded the scope of the license, infringing MSI's copyright, through its unauthorized modification and distribution of the Comet/CG source code in Windows hardware.[1] At trial the jury heard

---

[1] MSI argues on appeal that the jury could have found copyright infringement based solely on Media 100's act of giving the Comet/CG source code to Vanteon without MSI's permission. Media 100 essentially conceded this point at oral argument, but insisted that MSI did not present this theory of copyright infringement to the jury and the jury was not instructed to find infringement on this act alone. Our review of the trial transcript confirms that MSI did argue to the jury in its opening and closing state-
(continued...)

evidence of both parties' interpretations of the scope of the licensing agreement, and in particular the meaning of the phrase "Media 100 hardware." Media 100 now claims that because the evidence *better* supports its interpretation, it can *only* support its interpretation. This, however, is not the standard we use to review jury verdicts; faced with two permissible, conflicting interpretations, the jury in this case was entitled to resolve the ambiguity in the licensing agreement in favor of MSI.

**B. Copyright Infringement Damages**

The jury awarded MSI $1.2 million in actual damages plus $900,000 in lost profits on its copyright infringement claim. Media 100 claims on appeal that the jury's damages awards were unsupported by the evidence and that the lost profits award was duplicative of the actual damages award. Media 100 seeks to vacate the awards, or at least reduce the lost profits award, so that MSI does not receive "double damages." Our standard of review is the same here as for the copyright infringement claim: we are looking to see whether there is a reasonable basis in

---

[1] (...continued)

ments that Media 100's distribution of the source code to Vanteon constituted copyright infringement, and MSI's presentation of evidence throughout the trial is consistent with and supports this theory. But, as Media 100 points out, the jury was instructed that to find liability for copyright infringement it had to find that Media 100 copied or made a derivative work from the Comet/CG source code (as by hiring Vanteon to translate it) *and* that the license agreement limited Media 100's use of the code to Macintosh hardware. We agree with Media 100's reading of the instructions; therefore, we have reviewed the record for sufficient evidence of both Media 100's unauthorized distribution of the source code to Vanteon and of Media 100's unauthorized distribution of the source code in Windows hardware.

the record to support the jury's damages awards. *See Emmel*, 95 F.3d at 629.

### 1. Actual Damages

Media 100 claims that the $1.2 million award for actual damages is unsupported by the evidence. The Copyright Act permits a copyright owner to recover actual damages suffered as a result of the infringing activity and any profits of the infringer resulting from the infringement that are not otherwise taken into account in calculating actual damages. 17 U.S.C. § 504(b). Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer. *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357, 360 (7th Cir. 1985). MSI asserts that its actual damages can be calculated based either on the hypothetical value of an up-front license fee for Media 100 to distribute a Windows-compatible version of Comet/CG software, or on the approximate value of performing the translation of Comet/CG source code from Macintosh to Windows. Media 100 argues that damages based on the up-front license fee theory are speculative because they do not accurately identify the value of the Windows-compatible Comet/CG software to Media 100. In addition, Media 100 disputes MSI's claim that it can recover actual damages based on lost translation fees because the parties never agreed that Media 100 would hire MSI to convert the Comet/CG source code to Windows.

Despite Media 100's disagreement with the jury's calculations, MSI presented sufficient evidence at trial to sustain the jury's award of $1.2 million in actual damages for copyright infringement. It is not improper for a jury to consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine

actual damages, provided the amount is not based on
"undue speculation." *On Davis v. The Gap, Inc.*, 246 F.3d
152, 166 (2d Cir. 2001). *See also Interactive Pictures Corp.
v. Infinite Pictures, Inc.*, 274 F.3d 1371 (Fed. Cir. 2001)
(upholding award of actual damages based on estimated
lump sum royalty payment from infringer's projected
sales). In this case MSI presented the jury with several
ways of measuring actual damages, including: (1) the
value of a software development fee to convert MSI's
Comet/CG source code to Windows (equivalent to the
value of the translation project undertaken by Vanteon); (2)
the value of the software license fees Media 100 paid
to Inscriber, the third party supplier of Windows-compat-
ible character generation software whose product Media
100 eventually incorporated into its Finish product line
to replace the translated MSI Comet/CG software; (3)
the ratio of license fees paid to MSI for sales of Comet/
CG software incorporated into Media 100 (Macintosh)
products compared to the projected sales of a Windows-
compatible version of Comet/CG software incorporated
into Finish (Windows) products; (4) the ratio of software
development fees to software license fees based on prior
agreements between MSI and Media 100; or (5) the
terms of a hypothetical license fee between MSI and
Media 100 for a Windows-compatible version of Comet/CG
based on the relative size of the Macintosh market as
compared to the Windows market for such products. Media
100 maintains that all of these theories of recovery are
speculative because there is no evidence that Media 100
would have hired MSI instead of Vanteon to translate
MSI's Comet/CG source code or paid more to MSI for the
right to distribute a translated version of Comet/CG in
Media 100's Finish products. Neither of Media 100's claims
persuade us to reverse the jury's damage award in this
case.

First, Media 100 maintains that it would not have hired
MSI to translate the Comet/CG source code to Windows

because MSI did not have the technical capability or human resources to complete the project, and even assuming MSI could have done the work, Media 100 was not obligated under the license agreement to hire MSI for the job. This argument misses the point; MSI is entitled under the Copyright Act to recover actual damages resulting from the infringement of its copyright. In this case one element of infringement was Media 100's unauthorized creation (with Vanteon's paid assistance) of a derivative work—the translated Windows version of Comet/CG—based on MSI's copyrighted Comet/CG source code. Media 100's estimation of MSI's interest or ability in the translation project is irrelevant, for Media 100 infringed MSI's copyright in part by hiring Vanteon to translate the source code without permission from MSI, and MSI may lawfully seek damages resulting from this infringement.

Second, Media 100 claims that because MSI failed to establish either the actual value of the translated Comet/CG software as distributed in the Finish products or the value of the lost licensing fee to MSI, any part of the jury's award based on these values is purely speculative. But MSI was not required to establish the actual value; it was required only to provide sufficient evidence of the value so that the jury did not have to resort to undue speculation in estimating actual damages. *Deltak*, 767 F.3d at 360; *On Davis*, 246 F.3d at 166. At trial MSI presented substantial evidence of the value of Windows-compatible character generation software to Media 100, including: (1) Media 100's licensing and software development agreements with Inscriber ($1.43 million[2]); (2) the value of

---

[2] The values given are estimates and projections presented by MSI to the jury at various points in the trial; not surprisingly, Media 100 disputes these figures. Because we are required to take the evidence in the light most favorable to the prevailing

(continued...)

Media 100's contract with Vanteon to translate MSI's Macintosh software to Windows ($3.2 million); (3) Media 100's actual and projected sales of its Finish product line incorporating Windows character generation software ($10-$65 million); and (4) a hypothetical license fee based on the comparative size of the Macintosh and Windows market for video editing products ($9.75-$15.6 million). Combined with MSI's submission of its own past agreements with Media 100 to develop and modify prior versions of Comet/CG, the jury had ample evidence from which to estimate the value of Media 100's use of MSI's copyrighted source code and arrive at its $1.2 million actual damage award.

## 2.  Lost Profits

Media 100 next argues that the jury's award of $900,000 for lost profits should be vacated or reduced because the award was contrary to the evidence and duplicative of the $1.2 million actual damages award. The Copyright Act permits a copyright owner to recover any profits of the infringer resulting from the infringement that are not otherwise taken into account in calculating actual damages. 17 U.S.C. § 504(b). Media 100 maintains that it presented uncontroverted evidence at trial proving that it realized no profits from the sale of its Finish products incorporating the translated Comet/CG software; therefore, the jury must not have properly apportioned Media 100's profits as mandated by § 504(b) and as instructed by the court. Moreover, Media 100 claims that even if it had made any profits, the $900,000 award should be reduced to the extent that it amounts to "double counting"

---

[2] (...continued)

party when reviewing a jury verdict, we include here the figures that MSI submitted as evidence.

of MSI's actual damages. Both of these claims are unavailing.

First, the jury heard testimony from both MSI and Media 100 regarding the revenues and expenses associated with the distribution of Finish products incorporating the translated Windows version of Comet/CG software. From this evidence, the jury determined that Media 100 did, in fact, realize a $900,000 profit from its sales. MSI carried its initial burden under § 504(b) of proving Media 100's revenues by submitting evidence of Media 100's actual and projected sales of the Finish product line. Media 100 then had the burden of proving apportionment to the jury, *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989), by submitting evidence of its deductible costs and expenses. The jury in this case was specifically instructed by the court to deduct production and marketing expenses from Media 100's revenues in calculating any profit realized by Media 100.

Media 100's claim that it presented "uncontroverted" evidence of its expenses, which the jury presumably ignored, is simply false. At trial MSI challenged Media 100's calculation of fixed and variable expenses, some of which are deductible and some of which are not, and the jury even asked for clarification of the expenses from the judge during its deliberations. From this conflicting evidence, the jury could reasonably have concluded that Media 100's estimates of the value of Comet/CG to its Finish products and of its deductible expenses were incorrect or unsubstantiated, and chosen instead to credit MSI's revenue and expense figures when it calculated Media 100's profits. Media 100's contention on appeal that its costs and expenses far exceeded its revenues merely rehashes its unsuccessful arguments to the jury. Under these circumstances, and without any other evidence that the jury intentionally disregarded its duty to apportion profits, *see Pribyl*, 259 F.3d at 587 ("absent evidence

to the contrary, we assume that juries follow a court's instructions"), we cannot say that the jury's award is contrary to the evidence.

Second, Media 100 argues that the jury's $900,000 lost profits award was duplicative of the $1.2 million actual damages award and should be vacated. Lost profit damages serve to make the copyright owner whole in cases where the infringer's gains exceed the owner's losses. *See Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir. 1983). This is true even if the owner never would have realized the profit made by the infringer; by disgorging any net profits from the infringer, lost profit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner. *Id.* Here, Media 100 argues that had it paid MSI either the up-front license fee or the translation fee upon which the $1.2 million actual damage award was premised, its distribution of the translated, Windows-compatible Comet/CG software would not have been infringing, and MSI would not have been entitled to Media 100's profits. Media 100 is right about this, and it is exactly for this reason that copyright law *does* entitle MSI to recover Media 100's profits. Without this rule, Media 100 could infringe MSI's copyright without the risk of losing more than it would have had to pay not to infringe and with the benefit of keeping whatever profits it made by infringing. *See Taylor*, 712 F.2d at 1120.

MSI's recovery of Media 100's profits is, however, limited to only those profits attributable to the infringement that were not otherwise included in the jury's calculation of actual damages. As discussed earlier, MSI presented evidence at trial suggesting that it suffered anywhere from $1.43-$15.6 million in damages as a result of Media 100's copyright infringement. The jury was instructed to measure MSI's actual damages from the copyright infringement by "the amount a willing buyer would have been

reasonably required to pay a willing seller at the time of the infringement for the use made by Media 100 of [MSI]'s Comet/CG source code," and to measure Media 100's profits by "the amount of money that Media 100 made because of the infringement minus deductions for expenses in producing and marketing the infringing work." The jury also was told not to award lost profits for any amount that was already taken into account in determining actual damages. Even if we cannot know for certain which pieces of evidence the jury relied on in making each of its calculations, the instructions were proper as a matter of law and we must assume that the jury followed them. Because the evidence of MSI's injuries was more than adequate to support the jury's total damage award for copyright infringement, we conclude that the jury's award of $900,000 for lost profits was not duplicative of its award of $1.2 million in actual damages.

## C.  Trade Secret Misappropriation Damages

In its cross-appeal, MSI claims that the district court erred by vacating the jury's award of $300,000 in damages for trade secret misappropriation. We review the court's decision *de novo* and look to see whether there is sufficient evidence in the record to support the jury's damages award. *Mathur*, 207 F.3d at 941. In granting Media 100's post-trial motion for judgment as a matter of law on this issue, the district court ruled that MSI had failed to distinguish between its damages for copyright infringement and its damages for trade secret misappropriation, calling the trade secret damages duplicative and against the weight of evidence. The only explanation offered by the court for its decision was its belief that a successful claim for trade secret damages would have required MSI to argue and prove that it had suffered actual damages and lost unique ideas as a result of Media 100's breach of

confidentiality. The court did not elaborate further on why it felt that MSI had failed to carry its burden of proof on this issue.

Unlike the district court, we find that MSI presented ample evidence to support the jury's award of damages for trade secret misappropriation. The jury was clearly instructed by the court as to how it should properly calculate damages for both trade secret misappropriation and copyright infringement. Once both parties approve the jury instructions, they become the law of the case, *see Jabat, Inc. v. Smith*, 201 F.3d 852, 857 (7th Cir. 2002), and we assume that the jury applies the law as given to them to the facts as they find them, *see Pribyl*, 259 F.3d at 587. Because the Comet/CG source code represented both a trade secret and a protectible copyright, much of the evidence presented at trial could have been used to substantiate damages for either one or both claims. Still, it is undisputed that the jury was instructed to consider different measures of damages in determining each award.

In calculating trade secret damages, for example, the court told the jury to consider either "the cost Media 100 would have incurred in acquiring the same information or trade secret through its own experimentation or through other lawful means," or "the actual value of what has been appropriated or the reasonable royalty at the time of the misappropriation." The jury was also reminded that MSI had the burden of proving its damages "for actual loss [proximately] caused by the misappropriation" by a preponderance of the evidence. In comparison, the instruction for computing copyright damages told the jury to determine "the amount of money adequate to compensate [MSI] for the reduction of the market value of the copyrighted work caused by the infringement," as measured by "the amount a willing buyer would have been reasonably required to pay a willing seller . . . for the use made by Media 100 of [MSI]'s Comet/CG source code."

Although both instructions inform the jury that the value of the Comet/CG source code is relevant to determining damages, the value of the code is supposed to be measured differently in each instance. Therefore, it is neither surprising nor impermissibly duplicative for MSI to have presented numerous theories to the jury for calculating its losses.

As a matter of law, it is possible to recover damages based on more than one legal theory in the same suit, provided the plaintiff provides sufficient evidence of his injuries. *See Public Service Co. of Indiana v. Bath Iron Works Corp.*, 773 F.2d 783, 793-95 (7th Cir. 1985). Evidence in this record suggests that had Media 100 lawfully gone about acquiring the rights to the Comet/CG source code for the purpose of translating it into Windows, it either would have had to pay MSI to translate it or pay MSI for the right to hire someone else like Vanteon to translate it. Media 100 disputes this evidence, but the jury was entitled to draw this inference from what it heard at trial. In particular, the jury learned that Media 100's customers wanted any new Windows hardware to be compatible with their Macintosh hardware running Comet/CG, which meant that Media 100 had a strong incentive to translate the Comet/CG code rather than incorporate Windows-based character generation software from a different company. Moreover, the jury heard evidence from MSI to suggest that the value to Media 100 of acquiring MSI's trade secret in the Comet/CG source code would have ranged from $383,000 to $1.3 million; MSI based these figures on (1) past software development contracts between Media 100 and MSI (as compared with software licensing contracts which the parties also entered into), (2) the profits realized by Vanteon in translating MSI's Comet/CG source code, and (3) MSI's investment costs in the Comet/CG source code. In sum, the evidence shows that MSI suffered a measurable loss when Media 100 took

its trade secrets in the Comet/CG source code and gave them to Vanteon, a competing software development company. The evidence also shows that this loss was different from the loss that MSI suffered when Media 100 incorporated the translated source code into Widows-compatible products and profited from its unauthorized distribution. For these reasons we hold that it was error for the district court to vacate the jury's award of $300,000 to MSI for trade secret damages as duplicative of the copyright infringement damages.

## D.  Breach of Contract Damages

Media 100 disputes the validity of the jury's award of $85,000 to MSI for breach of contract. We review the jury's award for breach of contract damages to see if it is supported by sufficient evidence in the record. *Emmel*, 95 F.3d at 629. Media 100 admitted at trial that it failed to give MSI a copy of the translated Windows version of Comet/CG as required by the license agreement. Despite this admission, Media 100 maintains that MSI cannot obtain damages because MSI proved neither that it lost profits as a result of the breach nor that the software had any recoverable value. With respect to lost profits, the parties agreed at trial that such damages were not available to MSI, and the jury was so instructed. As for other damages arising from the breach, the court instructed the jury to ascertain "the sum that would put [MSI] in the same position it would have been in had the 1995 contract been fulfilled as agreed by Media 100. [MSI] is limited in recovery to the loss actually suffered and should not be placed in a better position than it would have been had the breach not occurred." The jury also was told that the contract capped any damages at the amount Media 100 paid for the license, or $85,000.

Media 100 argues that the jury could not have found it liable for the full amount of contract damages for its

breach because the translated character generation software had no value. Media 100 claims that the translated Comet/CG source code was only a small, and ultimately defective, part of a larger software bundle distributed with its Finish video editing systems. In contrast, MSI maintains that the translated software had significant value, as shown by the $2.6 million fee Media 100 paid Vanteon to create the Windows-compatible version, and also by the software's inclusion in the launch of the original Finish product line, whose sales were projected by Media 100 to reach nearly $10 million in its first year. There also is evidence in the record showing that Media 100 went to the trouble of translating MSI's Comet/CG software rather than licensing Windows-ready character generation software from another company because Media 100 knew that its current customers wanted any new Windows-based product from Media 100 to be compatible with its older Macintosh-based products. In light of this evidence the jury was entitled to come to its own conclusion regarding the value of the Comet/CG software and to award MSI the full measure of contract damages for Media 100's breach.

### E. Attorneys' Fees

Media 100 argues that the district court abused its discretion by awarding MSI attorneys' fees under the Copyright Act. Section 505 of the Copyright Act provides that "in its discretion" a district court may "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. When a court exercises its discretion to award attorney's fees under § 505 it should consider such non-exclusive factors as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of

compensation and deterrence." *Harris Custom Builders, Inc. v. Hoffmeyer*, 140 F.3d 728, 730 (7th Cir. 1998) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). This test does not dictate a precise rule or formula, but courts should treat prevailing plaintiffs and prevailing defendants alike. *Harris Custom Builders*, 140 F.3d at 730. A showing of bad faith or frivolousness is no longer required to receive attorney's fees. *See Budget Cinema, Inc. v. Watertower Associates*, 81 F.3d 729, 731 (7th Cir. 1996). We will reverse an award of attorney's fees under the Copyright Act only if the district court applied the wrong legal standard or abused its discretion. *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 457 (7th Cir. 2001).

Media 100 contends that the district court abused its discretion because it failed to consider the objective reasonableness of Media 100's defenses and based its award of attorneys' fees entirely on the jury's finding that Media 100 had willfully infringed MSI's copyright. Were this assertion true, Media 100 would have a more compelling claim. But the district court in this case applied the proper legal standard, considered all the relevant factors, appropriately exercised its discretion, and articulated its reasons for doing so; it was required to do no more.

The district court determined that both Media 100's willful infringement, as found by the jury, and the need to deter companies like Media 100 from "taking advantage of non-specific licensing agreements" justified the award of attorneys' fees in this case. In particular, the court noted that Media 100 had purposefully excluded MSI from participating in the translation of MSI's own proprietary Comet/CG source code and had willfully abandoned its responsibility to clarify the actual scope of the licensing agreement prior to undertaking the translation. The court explained that Media 100's failure to seek permission from MSI before it undertook the translation

project was particularly indefensible "in light of the dynamic nature of the market for software products." In *Wakeen Doll* we vacated a district court's award of attorneys' fees under the Copyright Act because the court had not explained why it made the award. 272 F.3d at 459. In that case we noted that the explanation need not be extensive so long as it gave us a reasonable basis for reviewing how the court exercised its discretion. *Id.* at 458. Here, we have ample evidence of how and why the district court exercised its discretion to award attorneys' fees, and under these circumstances we cannot say the court abused its discretion.

## F. Prejudgment Interest

Media 100 also challenges the district court's decision to award prejudgment interest to MSI, a decision that we review for abuse of discretion. *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999). The district court in this case correctly stated in making its award that "prejudgment interest is presumptively available to victims of federal law violations." *Gorenstein Enterprises, Inc. v. Quality Care U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). Media 100 contends that this court has never decided whether it is proper to award prejudgment interest for willful infringement under the Copyright Act; therefore, it suggests we follow the Third Circuit in requiring that liquidated damages or bad faith exist before awarding prejudgment interest. *See Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc.*, 609 F. Supp. 1325, 1327 (E.D.Pa. 1985), aff'd on other grounds, 797 F.2d 1222 (3d Cir. 1986) (analogizing copyright infringement with patent infringement and applying same prejudgment interest requirements to copyright situations as statutorily required by the Patent Act).

In *Gorenstein*, however, we affirmed an award of prejudgment interest for a trademark infringement, noting that

prejudgment interest was properly awarded for a wide variety of federal law violations. 874 F.2d at 436. We decided in that case that such interest was necessary to make the plaintiff whole and discourage delay by the defendant in making reparations. *Id.* The rule we articulated in *Gorenstein* was broad and we have consistently applied the presumption in favor of prejudgment interest for willful violations of federal law in the years since. *See, e.g.*, *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992); *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1259, 1331 (7th Cir. 1992); *Lorenzen v. Employees Retirement Plan of the Sperry & Hutchinson Co.*, 896 F.2d 228, 236 (7th Cir. 1990). Since the jury found Media 100's violation of the Copyright Act to be willful, and the district court properly applied this circuit's rule set forth in *Gorenstein*, we find that the district court's award of prejudgment interest to MSI was not an abuse of discretion.

### III. CONCLUSION

We conclude that there was sufficient evidence in the record to support the jury's determinations that Media 100 is liable to MSI for copyright infringement, that MSI suffered $1.2 million actual damages and $900,000 lost profits as a result of Media 100's copyright infringement, that MSI suffered $300,000 damages as a result of Media 100's misappropriation of its trade secrets, and that MSI suffered $85,000 damages from Media 100's breach of contract. We also hold that it was not an abuse of discretion for the district court to award MSI $192,283 attorneys' fees or $313,061 prejudgment interest based on Media 100's willful infringement of MSI's copyright.

Therefore, the district court's post-trial orders are AFFIRMED with respect to the copyright infringement liability, copyright infringement damages, breach of con-

tract damages, attorneys' fees, and prejudgment interest. We REVERSE the district court's order with respect to trade secret misappropriation damages and order the jury's award of $300,000 damages to MSI be REINSTATED.

A true Copy:

    Teste:

 

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*