**POLAR BEAR PRODUCTIONS, INC., a Montana corporation, Plaintiff–Appellant,**

v.

**TIMEX CORPORATION; Does 1–10, Defendants–Appellees.**

**Polar Bear Productions, Inc., a Montana corporation, Plaintiff–Appellee,**

v.

**Timex Corporation, Defendant–Appellant,**

**Does 1–10, Defendants–Appellees.**

**Nos. 03–35188, 03–35245.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 2004.

Filed Sept. 3, 2004.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 25, 2004.

Robert C. Lukes and Terry J. Mac-Donald, Missoula, MT, for Polar Bear Productions, Inc.

Roger L. Zissu, John P. Margiotta, New York, NY, and Ronald A. Bender, Missoula, MT, for Timex Corp.

Before BRUNETTI, McKEOWN, and GOULD, Circuit Judges.

## OPINION

McKEOWN, Circuit Judge:

This intellectual property case pits the sport of extreme kayaking against the iconic American timepiece, Timex. In an effort to update its image, Timex Corporation ("Timex") arranged with Polar Bear Productions ("Polar Bear") to produce film footage featuring some of the stars of whitewater kayaking, paddling through exotic locales in North and South America and using equipment bearing the Timex logo. The promotion was so popular with Timex that it just kept on ticking[1] and continued using the footage well beyond any permission to do so. The result is a lawsuit that has taken on a life far beyond a simple copyright and trademark case. Now, after two trials, two jury verdicts awarding in excess of $2 million to Polar Bear, and a long history between the parties, the case presents us with several novel issues of copyright law. The consequence of this appeal is a series of rulings resulting in yet another round in the trial court.

In response to Timex's unauthorized use of footage from its copyrighted film, Polar Bear brought state and federal copyright and trademark claims against the watchmaker. Through pretrial rulings, the district court disposed of all of Polar Bear's claims, with the exception of its copyright action. On this claim, the jury awarded Polar Bear $2.4 million in damages for actual damages and indirect profits stemming from Timex's infringement. Polar Bear appeals the district court's various orders precluding the remainder of its claims. Timex cross-appeals, arguing that Polar Bear's infringement claim is time-barred, and even if it is not, the jury award is invalid because the evidence does not demonstrate a sufficient causal nexus between the infringement and the amount awarded.

These appeals provide the opportunity to reiterate the principle that a plaintiff in a copyright infringement action must establish a sufficient causal connection between the infringement and the infringer's profits it seeks to recover. Because the evidence at trial was insufficient to support a finding that the lost and indirect profits resulted from Timex's infringements, we vacate the jury award. We also conclude the district court erred in barring prejudgment interest, and we reverse the district court's grant of Timex's motion for summary judgment on Polar Bear's trademark claim under state law. We affirm the district court on the remaining issues and claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In an effort to market its line of "Expedition" brand watches to outdoor sports

---

**1.** The phrase "It takes a licking and keeps on ticking" is a registered trademark of the Timex Corporation. See "Timex–Legal", *at* http://www.timex.com/html/legal.html.

enthusiasts, Timex, the Connecticut-based watch company, entered into a contract with Polar Bear, a Montana-based film production company. Timex agreed to sponsor Polar Bear's production of an extreme-kayaking film entitled "PaddleQuest." Under the terms of the sponsorship agreement, Timex paid Polar Bear a $25,000 fee and provided assistance in promoting and showing the film. In return, Timex received an exclusive one-year license to use the film in its promotional materials, and the Timex logo was featured prominently on the film's packaging and posters, as well as on equipment used in the film itself. The "PaddleQuest" promotion was, in Timex's words, "an unqualified success." Apparently, Timex enjoyed its association with "PaddleQuest" so much that it continued to use images from the film in its promotion of the Expedition line of watches after the license expired.

The most significant acts of infringement occurred when Timex used "PaddleQuest" materials at twelve different trade shows between 1995 and 1998. These materials included a ten minute promotional "loop tape"—so named because it is shown continuously—displayed at Timex's presentation booth at the trade shows. Under the license agreement, Timex had the option of retaining Polar Bear to produce such a video at a price to be determined by the parties. Timex instead notified Polar Bear that it planned to produce the tape separately. Polar Bear warned Timex that it had no right to use images from "PaddleQuest" without permission, and Timex agreed not to produce the tape. Nevertheless, without Polar Bear's knowledge or permission, Timex proceeded to create the video, one-third of which consisted of images from "PaddleQuest."

Polar Bear first learned of Timex's infringement approximately two years later when the producer of "PaddleQuest," one of Polar Bear's two shareholders, witnessed the Timex-produced loop tape playing continuously at a trade show. At the same trade show, employees of Polar Bear also witnessed Timex showing "PaddleQuest" in its entirety at its display booth as part of the watchmaker's promotional efforts.

Polar Bear later discovered that Timex used Polar Bear's copyrighted images on two other occasions—in a promotional campaign associated with the soft drink Mountain Dew and in videos used to train salespeople at a large national retailer. In all three instances, Polar Bear expressly denied Timex permission to use the images, and Timex deleted any reference to Polar Bear's copyright. Timex does not dispute that it used the copyrighted images without permission and beyond the period of time allowed by the license.

Polar Bear brought suit against Timex, alleging claims for copyright infringement under the Copyright Act, 17 U.S.C. § 101 et seq., removal of copyright management information under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202, trademark infringement under the Lanham Act, 15 U.S.C. § 1125, Montana statutory claims for trademark infringement and unfair practices, and common law claims for breach of contract, unjust enrichment, and unfair trade practices.[2] Before the first trial, the district court disposed of a number of Polar Bear's claims in a series of oral rulings. The district court precluded Polar Bear's effort

---

**2.** Timex disputes that Polar Bear adequately pleaded its claims of copyright management information removal and unfair trade practices under Montana common law. Neither claim appears in the original or amended complaint, but they are included in the pretrial order.

to claim attorney's fees under the DMCA, 17 U.S.C. § 1203. The district court reasoned that even though the pretrial order referenced the copyright information management statute, allowing this claim would result in "manifest injustice" because Polar Bear had not pleaded this claim in either its original or amended complaint, and the inclusion of the claim in the pretrial order "lacked candor." The district court also granted summary judgment to Timex on Polar Bear's unfair trade practices charge on the grounds that the Montana Consumer Protection Act only covers "personal, family, or household purchases of goods," not manufacturers' claims. Finally, the district court granted Timex's motion to dismiss Polar Bear's trademark infringement claims, concluding that both the Lanham Act and Montana trademark law claims were barred by a two-year statute of limitations. By dismissing Polar Bear's two state law tort claims, the district court effectively precluded Polar Bear from seeking punitive damages.

Considering only the copyright and breach of contract claims, the first jury returned a verdict for Polar Bear with compensatory damages totaling $2.1 million. However, the district court vacated the verdict and ordered a new trial on the grounds that Polar Bear violated certain pretrial evidentiary rulings. In advance of the second trial, the district court granted Timex's motion for judgment as a matter of law regarding Polar Bear's breach of contract claim, thus limiting the second trial to the issue of damages for copyright violations. The second jury returned a verdict of $2,415,00.00—in actual damages and $2.1 million in indirect profits related to Timex's infringements.[3]

Polar Bear appeals the district court's grant of summary judgment on its state law claim for trademark infringement, as well as its common law unfair trade practices claim, arguing that both claims should be governed by a three-year statute of limitations applicable to tort actions under Montana law. It also appeals the district court's decision to modify the pretrial order to remove its claim for attorney's fees under 17 U.S.C. § 1203. Polar Bear further contends that the district court erred in concluding that prejudgment interest on wrongful profits resulting from copyright infringement is unavailable under the Copyright Act of 1976. Timex cross-appeals, asserting that recovery for damages should be limited to instances of infringement occurring within three years of the commencement of the lawsuit. Timex also argues that there is insufficient evidence to support the jury award, and that the district court erroneously admitted the testimony of Polar Bear's expert witness.

## II. Copyright Act

### A. Damages Award

#### 1. Statute Of Limitations

The first issue we confront is Timex's claim that Polar Bear is barred from recovering monetary relief for infringements occurring more than three years prior to the commencement of its copyright action. Section 507(b) of the Copyright Act provides that copyright claims must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b).

◼ In copyright litigation, the statute of limitations issue that often arises is that the plaintiff filed its copyright claim more

---

**3.** Although the jury did not specify the components of the actual damages award, the $315,000 figure appears to reflect the $115,000 in lost license fees and $200,000 in lost profits that Polar Bear requested at trial. We also note that Polar Bear estimated the range of indirect profits to be between $1.7 million and $3.2 million.

than three years after it discovered or should have discovered infringement. Here, Timex makes a different, novel argument and asks us to rule that § 507(b) prohibits copyright plaintiffs from obtaining any damages resulting from infringement occurring more than three years before filing the copyright action, regardless of the date the plaintiff discovered the infringement. In *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1041–42 (9th Cir.2000), we left for another day precisely this argument; that day is now upon us. We conclude that § 507(b) permits damages occurring outside of the three—year window, so long as the copyright owner did not discover—and reasonably could not have discovered—the infringement before the commencement of the three-year limitation period. Because Polar Bear did not discover Timex's infringement until within three years of filing suit, Polar Bear may recover damages for infringement that occurred outside of the three-year window.

Our decision in *Roley v. New World Pictures, Ltd.*, 19 F.3d 479 (9th Cir.1994), illustrates the way the statute of limitations in § 507(b) operates. Roley, a screen writer, argued that he was entitled to recover damages for infringement that occurred before the three-year period prior to filing suit because the infringement was continuous—that is, there was an instance of at least one infringement within the three-year window. *Id.* at 480–81. We rejected this theory, reasoning that "in a case of continuing copyright infringements, an action may be brought for all acts that accrued within the three years preceding the filing of suit." *Id.* at 481. The copyright plaintiff cannot, however, reach back beyond the three-year limit and sue for damages or other relief for infringing acts that he knew about at the time but did not pursue. *Id.* Thus, we have the general rule that "[a] plaintiff's right to damages is limited to those suffered during the statutory period for bringing claims...." *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 992 (9th Cir.1998); *see also* 3 NIMMER ON COPYRIGHT § 12.05[B], 12–132–133 (2004) ("The prevailing view is .... that the statute of limitations bars recovery on any damage claim that accrued over three years prior to filing of suit").

Importantly, *Roley* also signals that this general rule does not erect an impenetrable wall preventing recovery for infringement occurring prior to the three-year window. *Roley* interpreted the term "accrue," as it is used in § 507(b), to be the moment when the copyright holder "has knowledge of a violation or is chargeable with such knowledge." *Roley*, 19 F.3d at 481. Synthesizing this definition of "accrue" with the language of § 507(b), the three-year clock begins upon discovery of the infringement. Because Roley was aware of the earlier infringement prior to the three-year limit for filing suit, those claims accrued outside the time allowed, and he was therefore prohibited from recovering damages for the earlier claims.

Thus, under *Roley*, the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances. Without the benefit of tolling in this situation, a copyright plaintiff who, through no fault of its own, discovers an act of infringement more than three years after the infringement occurred would be out of luck. Such a harsh rule would distort the tenor of the statute. Section 507(b), like all statutes of limitations, is primarily intended to promote the timely prosecution of grievances and discourage needless delay. It makes little sense, then, to bar damages recovery by copyright holders who have no knowledge of the infringement, particularly in a case

like this one, in which much of the infringing material is in the control of the defendant. *See* 3 NIMMER ON COPYRIGHT § 12.05[B], 12–135 (tolling statute of limitations until moment of discovery is "better" view of § 507(b)). As the Seventh Circuit explained, the limit imposed by § 507(b) should not be construed to prohibit recovery for prior infringement in every circumstance:

> Often, whether or not the defendant has done anything to conceal from the plaintiff the existence of the cause of action, the statute of limitations is tolled until the plaintiff learned or by reasonable diligence could have learned that he had a cause of action.... Although many cases state that mere ignorance of a cause of action does not toll the statute of limitations, in context these statements invariably mean only that the plaintiff has a duty of diligence: it is not enough that he did not discover he had a cause of action, if a reasonable man could have.

*Taylor v. Meirick*, 712 F.2d 1112, 1117–18 (7th Cir.1983).[4]

The critical question, then, is a familiar one: when did the plaintiff discover the infringement? Notwithstanding Timex's assertion that Polar Bear should have discovered the infringement earlier, the date of discovery is an issue of fact, *see Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir.2000), and the district court's determination will be upheld unless clearly erroneous. *See Dolman v. Agee*, 157 F.3d 708, 715 (9th Cir.1998). Timex presented no evidence that Polar Bear was aware of the

infringement prior to attending a trade show on August 9, 1997, and we therefore see no reason to disturb the district court's finding regarding the date of discovery. It is undisputed that Polar Bear filed its complaint against Timex on August 3, 2000, and thus Polar Bear commenced its suit "within three years after the claim accrued." In concluding that Polar Bear may recover damages on a claim that accrued at the moment of discovery, we decline Timex's invitation to adopt an inflexible bar against recovery for infringement occurring three years prior to the filing of the copyright action.

### 2. STATUTORY FRAMEWORK

■ This appeal raises a number of novel issues related to § 504(b),[5] the damages provision of the Copyright Act. Thus, we begin our analysis mindful of the text of the statute:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

■ Congress explicitly provides for two distinct monetary remedies—actual

---

4. In *Roley*, we rejected the Seventh Circuit's allowance of damages that accrued before the three years prior to filing suit in a *continuous* infringement case. *See Roley*, 19 F.3d at 481. However, in defining the term "accrue" as the moment a copyright holder knows of or should know of the infringement, we in fact adopted the Seventh Circuit's approach to

tolling the statute of limitations until the moment of discovery. *Id.*

5. Because Polar Bear did not register its copyright before infringement, it can recover only actual damages and profits under § 504(b), not statutory damages under § 504(c).

damages and recovery of wrongful profits. These remedies are two sides of the damages coin—the copyright holder's losses and the infringer's gains. "Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir.2003); *see also Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir.2002) (approving of recovery of reasonable license fee).

■ To take away incentives for would-be infringers and "to prevent the infringer from unfairly benefitting from a wrongful act," the statute also provides for the recovery of wrongfully obtained profits resulting from the infringement. H.R.Rep. No. 94–1476, § 504, at 161 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5777; *cf. Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 517 (9th Cir. 1985) ("*Frank I*") (interpreting the Copyright Act of 1909). These profits can be direct or indirect. Profits indirectly gained from infringements used in promotional efforts, as is the case here, fall squarely within the rubric of wrongful profits. *See generally, Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789 (8th Cir.2003); *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514 (4th Cir.2003); *Mackie*, 296 F.3d at 914; *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir.2001); *Cream Records Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828 (9th Cir.1985).

■ Under § 504(b), actual damages must be suffered "as a result of the infringement," and recoverable profits must be "attributable to the infringement." From the statutory language, it is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual dam-ages and profits. We take this opportunity to reaffirm the principle that a plaintiff in a § 504(b) action must establish this causal connection, and that this requirement is akin to tort principles of causation and damages. *See Mackie*, 296 F.3d at 915 & n. 6, 916–17 (applying tort principles to evaluate the claim for indirect profits and assessing the quantum of actual damages). We now turn to the damages award.

### 3. ACTUAL DAMAGES

The jury awarded Polar Bear $315,000 in actual damages, a figure apparently consisting of lost license and renewal fees and lost profits. *See supra* note 3. We review de novo the district court's denial of Timex's motion for judgment as a matter of law on the actual damages award. *See G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1108 (9th Cir.2003). Although we conclude that the portion of the award related to the license and renewal fees is supported by the evidence, we remand the actual damages award for remission of the excess by Polar Bear because the lost profits portion is speculative.

■ In our review of Timex's challenge to the actual damages award, we must assess whether the award is non-speculative—that is, whether it is sufficiently supported by evidence. *See On Davis*, 246 F.3d at 161. A jury award must be upheld if it is supported by substantial evidence. *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002). The relevant inquiry is whether the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury verdict: "Although [we] should review the record as a whole, [we] must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute [our] view of the evidence for that of the jury." *Id.* at 918.

■ Applying this deferential standard, we conclude that sufficient evidence supports the portion of the award related to the license fee. The jury heard the testimony of one of Polar Bear's expert witnesses, Paul Sepp, a certified public accountant, who calculated a reasonable production and license fee by determining their fair market value. His valuation, predicated on the price Polar Bear quoted to produce the loop tape for Timex in 1995, was justified as being within the range of the fair market value.[6] Thus, "the jury's verdict[ ] find[s] substantial support in the record and lie[s] within the range sustainable by the proof." *Los Angeles Mem'l Stadium Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1365 (9th Cir.1986).

Timex argues that Polar Bear cannot recover the amount of Sepp's estimate because Polar Bear never charged that rate. This argument is curious. The $37,500 price tag reflects the amount Polar Bear actually quoted to Timex. Instead of paying the fee, Timex used Polar Bear's copyrighted footage without authorization. Having taken the copyrighted material, Timex is in no better position to haggle over the license fee than an ordinary thief and must accept the jury's valuation unless it exceeds the range of the reasonable market value. The proposed license fee was proffered before Timex's infringement. Nothing suggests that the fee was contrived or artificially inflated.

Timex also challenges the license fee award as speculative because Sepp based his valuations, in part, on consultations with the principals of Polar Bear. Common sense dictates that an expert may confer with the copyright holder and that the background data may be factored into calculations of actual damages. As the Seventh Circuit noted, "[i]t is not improper for a jury to consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine actual damages, provided the amount is not based on 'undue speculation.'" *McRoberts Software*, 329 F.3d at 566.

Timex's remaining grievances, such as the claim that Sepp's calculation is invalid because he does not have particular training in valuing film rights, and the presence of contrary evidence about the license value, were matters argued to and considered by the jury. Such is the nature of trial advocacy—the jury was presented with a panoply of evidence and arguments, not all of them congruent or consistent. The jury was not required to adopt Timex's view, nor do we substitute our view for the jury's verdict where the award is supported by substantial evidence. We therefore conclude that the district court did not err in denying the motion for judgment as a matter of law as to Polar Bear's lost license fee.

■ The award for lost profits is a different story. At trial, witnesses for Polar Bear testified that the company's losses during the period of Timex's infringement totaled $200,000. Polar Bear advanced the theory that it could have sold at least 10,000 to 15,000 copies of "PaddleQuest" at a profit of between $20 to $30 per copy, but was unable to do so because it had overextended itself and lacked the financial where-withal to sell the additional videos. Polar Bear concluded that, but for Timex's failure to pay for its use of "PaddleQuest," it would have had the necessary funds to produce these tapes, thus reaping the profits from its would-be sales.

---

6. Sepp estimated the license fee for showing "PaddleQuest" in its entirety for promotional purposes to be the same as the license fee for using "PaddleQuest" clips in a promotional video.

This theory of liability is too "pie-in-the-sky." *Cf. MindGames, Inc. v. Western Pub. Co.*, 218 F.3d 652, 658 (7th Cir.2000) (holding that in a breach of contract context, "a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate ... capitalizing fantasized earnings into a huge present value sought as damages.... Damages must be proved, and not just dreamed"). Although it is hypothetically possible that Polar Bear's business venture would have been more successful if it had greater access to cash, Timex's failure to pay license fees for the use of the footage was not the cause of Polar Bear's inability to put 10,000 copies of "PaddleQuest" on the market. *Cf. Mackie*, 296 F.3d at 914–15 (holding that there must be "a legally sufficient causal link between the infringement and subsequent indirect profits"). Importantly, in 1995 Polar Bear had no knowledge of Timex's infringement and certainly could not have relied upon the prospect of payment for Timex's use of "PaddleQuest." Indeed, had Polar Bear been aware of Timex's infringement at that time, its copyright claims would be barred under the three-year limit imposed by 17 U.S.C. § 507(b).

Polar Bear's financial losses were not of Timex's making, and mere speculation does not suffice to link the losses to the infringement. *See id.* It is too speculative to say that Timex's failure to pay a modest license fee was the cause of Polar Bear's business failure. Thus, it was error for the district court to deny Timex's motion for judgment as a matter of law on the claim for lost profits.

■ Where a jury awards damages in a lump sum, as is the case with the actual damages award, we generally do not disturb the damages award unless the result-ing award exceeds the amount sustainable by evidence in the record. "Even a total inadequacy of proof on isolated elements of damages claims submitted to a jury will not undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of the evidence." *Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1366. Here, the evidence supporting the legitimate element of the actual damages award cannot sustain the aggregated $315,000 award. We therefore affirm the lost license and renewal fee award but remand to the district court to order a remission of the excess by the plaintiff for the remaining portion of the award. *See id.*

## 4. INDIRECT PROFITS

Section 504(b) provides recovery for "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). "On its face, § 504(b) does not differentiate between 'direct profits'—those that are generated by selling an infringing product—and 'indirect profits'—revenue that has a more attenuated nexus to the infringement." *Mackie*, 296 F.3d at 914. Consequently, we have held that, like its predecessor, § 504(b) is "expansive enough to afford parties an indirect profits remedy under certain conditions." *Id.*

We have repeatedly affirmed the availability of this remedy under the Copyright Act of 1976. *See, e.g., Mackie*, 296 F.3d at 914; *Cream Records*, 754 F.2d at 828; *see also Frank I*, 772 F.2d at 517 (Copyright Act of 1909). As we elaborated in *Mackie*, however, because the amount of profits attributable to the infringement in an indirect profits case is not always clear, "we have held that a copyright holder must establish the existence of a causal link before indirect profits damages can be re-

covered."[7] *Mackie,* 296 F.3d at 914. "When an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner." 4 NIMMER ON COPYRIGHT § 14.03, 14–34; *see also Frank I,* 772 F.2d at 517 ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

Section 504(b) sets forth the evidentiary burdens for recovery of profits: "The copyright owner is entitled to recover ... any profits of the infringer that are attributable to the infringement.... In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Thus, § 504(b) creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement.

This appeal requires us to apply the fundamental standard articulated in our decision in *Mackie:* that a copyright infringement plaintiff seeking to recover indirect profit damages "must proffer some evidence ... [that] the infringement

at least partially caused the profits that the infringer generated as a result of the infringement." *Mackie,* 296 F.3d at 911 (discussing the standard for summary judgment). From this principle, it is implicit that the profits sought are those that arise from the infringement. Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement.[8] The result is that a plaintiff seeking to recover indirect profits must "formulate the initial evidence of gross revenue duly apportioned to relate to the infringement." 4 NIMMER ON COPYRIGHT § 14.03[B], 14–39.

Although the statute only references the broad term "gross revenue," to conclude that a copyright plaintiff need only provide the company's overall gross revenue, without regard to the infringement, would make little practical or legal sense. Otherwise, the plaintiff in a copyright action against a multidivision, multi-product company such as General Mills, would need to do nothing more than offer an overall gross revenue number—like $11.5 billion—and sit back. *See Taylor,* 712 F.2d at 1122. But the causation element of the statute serves as a logical parameter to the range of gross profits a copyright plaintiff may seek. This rule of reason "obviates a good deal of mischief" in claiming profits beyond what might be attributable to the infringement, 4 NIMMER ON COPYRIGHT § 14.03[B], 14–39, without diminishing the

---

7. We do not suggest that a showing of causation is required only for claims of indirect profits, but that causation in indirect profit claims is often more attenuated than claims for actual damages or direct profits. It is therefore particularly important for the plaintiff in indirect profit action to demonstrate the alleged causal link between the infringement and profits sought.

8. Like us, our sister circuits have taken the statute's general reference to "gross revenue" to mean the gross revenue associated with the infringement, as opposed to the infringer's overall gross sales resulting from all streams of revenue. *See On Davis,* 246 F.3d at 160 (2d Cir.2001); *see also Bouchat,* 346 F.3d at 520–21 (4th Cir.2003) (citing *On Davis* and *Mackie* ).

benefit § 504(b) confers on plaintiffs. The standard is straightforward: a copyright plaintiff is bound to no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought. *See On Davis*, 246 F.3d at 160.

With these requirements in mind, we address Timex's challenge to the $2.1 million indirect profit award. At trial, Polar Bear estimated that it was entitled to recover between $1.7 and $3.2 million in Timex's profits allegedly gained from its unauthorized use of Polar Bear's copyrighted material. Polar Bear's request was based on the testimony of its expert witness, Professor Robert Hansen, who arrived at his estimate by aggregating the purported profit resulting from three sources: 1) Timex's direct sales at trade shows; 2) its use of a still image in a promotion affiliated with the soft drink Mountain Dew; and 3) the overall enhancement of brand prestige resulting from Timex's association with the sport of extreme kayaking.

As to the trade show booth calculation, Hansen reviewed Timex's sales records from the twelve trade shows where it showed the unauthorized "PaddleQuest" materials. Hansen calculated that Timex yielded an average of $30,000 in sales per show, for a total of $360,000 in gross revenue. Based on his experience evaluating trade shows, he concluded that approximately 10% to 25% of trade show sales are the result of excitement created by the booth promotion, of which the "PaddleQuest" materials were a substantial part.

Hansen's testimony established the requisite causal connection between the category of profits sought-revenue from trade booth sales—and the infringement. Thus, Polar Bear's request is a reasonable approximation of the profit related to infringement. Under § 504(b), Polar Bear

was not required to separate the gross profits resulting from the infringement from the profits resulting from other sources, but it undertook to do so anyway. Using a profit margin determined from Timex's invoices, Hansen estimated that Timex gained between approximately $20,000 and $50,000 in net profit from the infringement. In claiming only a portion of the $360,000 in gross revenues from booth sales, Polar Bear recognized "the impropriety of awarding [Polar Bear] all of[Timex's] profits on a record that reflects beyond argument that most of these profits were attributable to elements other than the infringement." *Cream Records*, 754 F.2d at 829. Polar Bear more than satisfied the sole requirement of "a reasonable approximation" in assessing the amount of profits attributable to the infringing material. *Id.* (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 408, 60 S.Ct. 681, 84 L.Ed. 825 (1940)).

Sufficient circumstantial evidence also supports Polar Bear's argument that the use of "PaddleQuest" images contributed to sales of Expedition watches in Timex's promotional efforts with Mountain Dew. The Mountain Dew promotional materials offered consumers the opportunity to purchase a Timex Expedition watch at a discounted price. Polar Bear demonstrated a sufficient causal nexus through evidence that the Mountain Dew booklet contained an advertisement featuring the infringing material, that customers who ordered Timex Expedition watches through the Mountain Dew promotion would have seen the advertisement, and that Timex profited from the promotion. Polar Bear satisfied its burden of establishing the infringer's relevant gross revenue, as required by § 504(b), by presenting sales figures from Timex's press releases stating that the Mountain Dew promotion generated $564,000 in sales. Although it was not

required to apportion the gross profit figure, Polar Bear claimed only $242,520 in Timex's profits, based on an estimated profit rate of 43%. Under § 504(b), the primary responsibility for further apportionment of profits fell to Timex.

Because the jury did not delineate the individual components of its total indirect profits award, it is impossible to tell whether the portion of the award related to the Mountain Dew promotion was duly apportioned. *See Cream Records*, 754 F.2d at 828–29 (stating that apportionment necessary where an infringer's profits are not entirely due to the infringement). In the absence of evidence to the contrary, we presume that the jury fulfilled its duty to apportion profits. *See* MOORE'S FEDERAL PRACTICE 3d § 52.34[2a] (noting that the amount and apportionment of damages is given "great deference").

■ Our deferential review of the verdict cannot, however, insulate the basis for the overwhelming bulk of the indirect profits claim, namely, Timex's purported revenue derived from the enhanced prestige of the Expedition line of watches. Substantial evidence does not support the required causal link between the infringement and the revenue derived from enhanced brand prestige. Because the other damages claims—trade show sales and the Mountain Dew promotion—cannot total to the overall $2.1 million verdict, nor can they be fairly segregated from the total, we are left with no choice but to vacate the award.

Using a method called "brand premium analysis," Hansen posited that a significant portion of the price increase for Expedition watches during a four-year period was the result of customers' favorable feelings generated by Timex's promotional efforts involving "PaddleQuest" materials. Multi-

plying the increase in the average watch price with the number of watches sold, Hansen determined that Timex's enhanced brand premium was worth approximately $10 million in gross revenue, translating to a $6 million gain in net profits. Finally, Hansen attributed between one-quarter and one-half of that profit to the cumulative effect of the copyright infringement at the twelve trade shows, resulting in approximately $1.5 million and $3 million in indirect profits.

Timex argues that the brand premium analysis is per se invalid, as it does not speak to the issue of causation and does not directly measure gross revenue resulting from sales. We agree the award must be vacated, but for the narrower and more run-of-the-mill reason that Polar Bear failed to establish the required causal nexus between the infringement and the profits sought. Although brand premium analysis may be, in certain cases, a valid method of calculating the impact of advertising on the profitability of a product, the use of this methodology does not alleviate the obligation of establishing a causal nexus between the infringement and profits sought. We do not address the question of whether the brand premium analysis arrives at a reasonable estimate of the profits because Polar Bear failed to satisfy its antecedent obligation of demonstrating causation.[9] *See Mackie*, 296 F.3d at 915 ("[T]here must first be a demonstration that the infringing acts had an effect on profits before the parties can wrangle about apportionment.").

To recover indirect profits under its brand premium theory, Polar Bear shoulders the burden of demonstrating that the infringement is causally linked to the revenues from the sales of all Expedition watches. *Id.* at 916 (requiring plaintiff in

9. Because we vacate the indirect profits award for lack of causation, we do not reach Timex's challenge to the admission of Hansen's testimony.

copyright infringement to demonstrate causal link to revenue sought). Polar Bear's theory of the causal link between Timex's infringement and its increased revenue is that the infringement at the trade shows created excitement about the product and an association between Expedition watches and outdoor sports, that the excitement and association generated at the trade shows somehow translated into consumers purchasing Timex's products, and that consumer enthusiasm permitted Timex to increase prices and generate more revenue. According to Polar Bear, the necessary causal link is evidenced by Timex's statement that the "PaddleQuest" promotion was an unqualified success, as well as evidence that "PaddleQuest" images formed a significant part of Timex's promotion at the twelve trade shows. Unfortunately, even taking this circumstantial evidence in the light favorable to the jury verdict, we conclude as a matter of law that evidence of the requisite causal connection is woefully insufficient.[10] Polar Bear's theory stretches the causation rubber band to its breaking point.

A comparison of indirect profits cases illustrates why the evidence fails to support this element of the award. In its recent decision in *Andreas*, which both parties cite in support of their causation arguments, the Eighth Circuit held that a copyright plaintiff adequately established the causal nexus between an automobile manufacturer's use of infringing material in a widely-aired commercial and a portion of profits from the sale of the automobile. *Andreas*, 336 F.3d at 797–98. Reversing the district court's grant of a motion for judgment as a matter of law, the Eighth Circuit relied on evidence that the infringing material "was the centerpiece of a commercial that essentially showed nothing but [the advertised product] .... that [the infringer] enthusiastically presented the commercial to its dealers as an important and integral part of its launch of [the product] ... sales of the[product] during the period that the commercial aired were above [infringer's] projections; the [ ] commercials received high ratings on ... surveys that rated consumer recall of the commercials; and [infringer] paid [the advertising company that created the commercial] a substantial bonus based on the success of the commercials." *Id.* at 796–97.

Although *Andreas* does not necessarily set the bar for what is sufficient evidence of a causal nexus, comparing Polar Bear's claim vividly highlights its deficiencies. Missing is the link between the infringement and revenue resulting from sales.[11] In contrast to *Andreas*, no evidence establishes that the infringement may have actually influenced the purchasing decisions

---

**10.** Although substantial evidence does not support the jury award, the district court properly instructed the jury on the need to prove a causal nexus, stating: "Indirect profits have a less direct connection or link to the infringement. Plaintiff seeks indirect profits in this case. To recover indirect profits, Plaintiff must establish a causal relationship between the infringement and the profits generated indirectly from such infringement."

**11.** Like the defendant's use of infringed material at issue in *Andreas* and *On Davis*, the promotional nature of Timex's use of "PaddleQuest" in trade shows places the infringe-

ment solidly within the realm of acts that potentially create liability for indirect profits. Nevertheless, a copyright plaintiff asserting recovery of revenue gained from infringement in advertising must establish a non-speculative link between the infringement and the actual profits recovered. *See Frank I*, 772 F.2d at 517 ("Given promotional nature of [infringement], we conclude indirect profits ... *are recoverable if ascertainable*") (emphasis added). Here, Polar Bear succeeds in establishing the promotional nature of Timex's infringement, but fails to provide evidence that resulting profits are ascertainable.

of those that bought Timex's watches at retail stores or other outlets—the decisions that lead to increased sales revenue, which is the foundation of profits recoverable under § 504(b).

Polar Bear concedes that the "Paddle-Quest" images were only shown at trade shows and in the Mountain Dew promotion. Actual retail purchasers were never exposed to the infringing images from the trade shows, nor did the evidence link retail consumers to the trade show promotion. Nor was there evidence that vendors at the trade shows somehow transmitted enthusiasm to retail customers. While there is no requirement that Polar Bear put Timex customers on the witness stand to testify that they purchased watches because of Timex's use of "PaddleQuest" images, *see Andreas*, 336 F.3d at 797 (rejecting notion that copyright plaintiff required to have customer testify that infringement caused purchase decision), a copyright plaintiff must present a modicum of proof linking the infringement to the profits sought. Here, too many question marks remain between the promotional infringement, the purported enthusiasm generated among wholesalers and retailers by the advertising, the increased prices, and Timex's ultimate profits. Timex's statement of satisfaction with the initial "PaddleQuest" promotion and its use of "PaddleQuest" images do not suffice as the links because they do not explain how the infringement influenced the purchasing decisions that lead to increased prices and ultimately to increased profits.

Polar Bear's claim to the profits Timex allegedly derived from brand prestige is less like *Andreas*, which dealt with revenue from actual sales, and is more like cases involving claims to indirect profits purportedly resulting from enhanced good will, a theory generally rejected by courts.

*See, e.g., Deltak Inc. v. Advanced Sys., Inc.,* 574 F.Supp. 400 (N.D.Ill.1983), *vacated on other grounds,* 767 F.2d 357 (7th Cir.1985) (rejecting as speculative claim for defendant's profits on increased product sales due to infringing sales pamphlet);

*Roy Export Co. Establishment v. Columbia Broad. Sys., Inc.,* 503 F.Supp. 1137 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1095 (2d Cir.1982) (rejecting as speculative profits derived from prestige allegedly resulting from broadcasting infringing motion picture); *Orgel v. Clark Boardman Co. Ltd.,* 128 U.S.P.Q. 531 (S.D.N.Y.1960), *modified,* 301 F.2d 119 (2d Cir.1962) (rejecting as speculative a claim for collateral profits based upon defendant's increased income from law practice, allegedly derived from status as author of infringed treatise). Polar Bear's claim to the infringer's profits is similar: Timex's infringement enhanced prestige, and that prestige generated profits. And like those cases, it is impossible to connect the dots of Polar Bear's theory because there is a gap between the infringement and actual sales revenue—and thus, the alleged profits. The stretch between the infringing material and the ultimate price increase resulting in substantial revenues is simply that—a stretch.

Additionally, Polar Bear claimed a portion of Timex's profits from all Expedition watch sales, even though the evidence could, at best, only support a far narrower universe of profits. Thus, even if we suspect that Timex derived some quantum of profits from the infringement because its infringement was part of promotional efforts, it nevertheless remains the duty of the copyright plaintiff to establish a causal connection between the infringement and the gross revenue reasonably associated with the infringement. *See On Davis,* 246 F.3d at 160. Only then would Timex bear the responsibility for apportioning profits. *Id.* But instead, Polar Bear sought profits

beyond the scope the evidence could support, and thus the gains reflected through enhanced brand prestige is speculative. *Cf. Frank Music Corp. v. Metro Goldwyn–Mayer, Inc.*, 886 F.2d 1545, 1554 (9th Cir. 1989) (holding that percentage increase in stock value of parent company too speculative and attenuated).

Because Polar Bear failed to demonstrate a nonspeculative causal link between the trade show promotion and the increased revenue from Expedition watches, we conclude that the district court erred in allowing the jury to consider the claim of profits associated with the brand premium calculation.

 The jury did not detail how it arrived at the $2.1 million indirect profits figure. We are therefore unable to determine how much of the award the jury attributed to the brand premium effect. It is evident from the record, however, that the elements of the award that were supported by substantial evidence-namely, the booth sales and the Mountain Dew promotion-could conceivably comprise only a small fraction of the $2.1 million total for indirect profits. At most, these elements total to no more than approximately $333,000 under Polar Bear's theory of liability. Under any scenario, the invalid portion of the indirect profit award far eclipses the legitimate portion. Like the actual damages award, the indirect profits award "exceeds the maximum amount sustainable by the probative evidence." *Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1366. Because the total award cannot be supported in light of the evidence as a whole, and because the record does not provide a sufficient basis for appellate review of specific portions of the award, we vacate the entire indirect profits damages award.

### B. PREJUDGMENT INTEREST

Polar Bear also appeals the district court's denial of its motion for allowance of prejudgment interest on its actual damages and Timex's wrongful profits. Although we vacated the indirect profits award, this issue is not moot because some portion of the actual damages award will remain after remittitur.

 Whether prejudgment interest is available under the Copyright Act of 1976 is an issue of first impression in this circuit. Confronted with this novel issue, the district court concluded that prejudgment "interest is not available under the 1976 copyright law," and noted, "even if interest were available, or were, arguably, to be said to be available as a matter of discretion, this is not a case . . . in which exercise of that discretion would be appropriate." Whether prejudgment interest is available is a question of law and is reviewed de novo. Consistent with our reasoning in *Frank II*, we conclude that prejudgment interest is available under the Copyright Act of 1976.[12]

In *Frank II*, we held that prejudgment interest is available under § 101(b) of the 1909 Copyright Act, the predecessor to § 504(b) of the 1976 Copyright Act. At the time *Frank II* was decided, the Sixth Circuit's decision in *Robert R. Jones Associates, Inc. v. Nino Homes*, 858 F.2d 274

---

12. Because its decision to deny prejudgment interest was based in part on an erroneous legal standard and because this opinion drastically alters the damages landscape in this case, we conclude the district court should reconsider its ruling on prejudgment interest. *See In re Arden*, 176 F.3d 1226, 1228 (9th Cir.1999) (holding that a district court abuses its discretion when it applies an erroneous legal standard). In remanding, we take no position on whether prejudgment interest should or should not be awarded, leaving that decision to the district court's sound discretion.

(6th Cir.1988), was the only opinion from our sister courts discussing the availability of prejudgment interest in copyright infringement cases.[13] The Sixth Circuit reasoned that, in the particular context of that case, prejudgment interest was not necessary to achieve the statute's goals of deterrence and vacated the award. *Id.* at 282. Because the Sixth Circuit considered the 1976 statute, we observed that the analysis in *Robert R. Jones* was "of limited utility in determining whether prejudgment interest should be allowed under the 1909 Act." *Frank II,* 886 F.2d at 1551 n. 8. In *Frank II,* we concluded that prejudgment interest ordinarily should be awarded: "because the 1909 Act allows plaintiffs to recover only the greater of the defendant's profits *or* the plaintiff's actual damages, an award of profits or damage under the 1909 Act will not necessarily be adequate to compensate a prevailing copyright owner." *Id.* at 1552 (citations omitted) (emphasis in original). *Frank II* left open the question whether the remedy is available under § 504(b) of the 1976 statute.

Since *Frank II,* other circuits have, to varying degrees, weighed in on the issue of whether prejudgment interest is available for claims of copyright infringement brought under the 1976 Act. The First Circuit held that it was not an abuse of discretion to deny prejudgment interest where the entire damages award was composed of disgorged profits from an infring-er, but noted that prejudgment interest may be awarded if a plaintiff's award includes actual damages.[14] *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.,* 322 F.3d 26, 51 (1st Cir.2003). In permitting prejudgment interest, the Tenth Circuit applied *Frank II's* rationale to a claim brought under § 504(b), but did so without discussion of potential differences between the 1909 and 1976 statutes. *See Kleier Adver.,* 921 F.2d at 1040–41 (10th Cir.1990). And recently, the Seventh Circuit held that prejudgment interest is available in cases of willful violations of § 504(b), observing that prejudgment interest is, as a general matter, routinely available for willful violations of federal law. *See McRoberts Software,* 329 F.3d at 572–73. Such a remedy, reasoned the Seventh Circuit, is animated by the need to make the plaintiff whole and discourage delay by the defendant in making reparations. *Id.* at 572.

In contrast, the district court here reasoned that by adding the remedy for attorney's fees in the 1976 Act—a remedy unavailable under the 1909 Act—Congress signaled that its statutory scheme for recovery did not include prejudgment interest. The district court's interpretation attempts to divine congressional intent from congressional silence, an enterprise of limited utility that offers a fragile foundation for statutory interpretation. *Cf. Osborn v.*

---

**13.** The Second Circuit also affirmed an award under the 1909 Act that included prejudgment interest, but did so without addressing the issue. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651, 656 (2d Cir.1978).

**14.** Although the availability of prejudgment interest under the 1976 Act is an unsettled question in the Second Circuit, the United States District Court for the Southern District of New York routinely awards prejudgment interest for § 504(b) violations, regardless of whether the underlying award is comprised of statutory damages or actual damages plus profits attributable to the infringement. *See, e.g., TVT Records v. Island Def Jam Music Group,* 279 F.Supp.2d 366, 409–10 (S.D.N.Y. 2003) (citing *Frank II, McRoberts Software,* and *Kleier Adver. v. Premier Pontiac, Inc.,* 921 F.2d 1036 (10th Cir.1990)); *Broad. Music, Inc. v. R. Bar of Manhattan, Inc.,* 919 F.Supp. 656, 661 (S.D.N.Y.1996); *Softel, Inc. v. Dragon Med. and Scientific Communications., Ltd.,* 891 F.Supp. 935, 945 (S.D.N.Y.1995); *RSO Records, Inc. v. Peri,* 596 F.Supp. 849, 860–62 (S.D.N.Y.1984).

*Am. Ass'n of Retired Persons,* 660 F.2d 740, 745 (9th Cir.1981) (in determining whether a statute confers a private right of action, noting that "[making inferences] on the basis of congressional silence is a hazardous enterprise at best") (internal quotes omitted). It is equally as plausible that Congress incorporated the remedy of fees on the assumption that this addition would not preclude remedies ordinarily available for willful violations of federal law. Or it may not be. Legislative silence, by itself, is an ambiguous guidepost.

More persuasive are the reasons articulated in our interpretation of the 1909 Act in *Frank II,* which are in accord with the decisions of our sister circuits on the 1976 Act. These cases provide that prejudgment interest is a generally available remedy, and its application in a particular case hinges on whether such an award would further the statute's purpose. This interpretation is also in keeping with the principle that, even in absence of legislative direction, a court may, in its discretion, award interest if necessary to effectuate legislative intent. As the Supreme Court explained over half a century ago:

> [T]he failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. For in the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them. . . .

*Rodgers v. United States,* 332 U.S. 371, 373, 68 S.Ct. 5, 92 L.Ed. 3 (1947) (internal citations omitted).

Like its predecessor, the purpose of § 504(b) is to compensate fully a copyright owner for the misappropriated value of its property and "to avoid unjust enrichment by defendants, who would otherwise benefit from this component of profit through their unlawful use of another's work." *TVT Records,* 279 F.Supp.2d at 410. Notwithstanding the addition of attorney's fees as a remedy under the 1976 Act, and the fact that § 504(b) permits recovery of both actual damages and defendant's profits rather than just one or the other, those remedies do not necessarily compensate for the time delay occasioned by infringement and eventual recovery.

It is not difficult to imagine a case involving undisputed copyright infringement—as is the case here—in which prejudgment interest may be necessary to discourage needless delay and compensate the copyright holder for the time it is deprived of lost profits or license fees. Nor does the ability to recover multiple forms of remedies render prejudgment interest superfluous. Frequently, a copyright plaintiff can only recover one type of remedy, be it actual damages or indirect profits, and the statutory availability of both remedies does not mitigate harm caused by delay in making reparations—a harm the remedy of prejudgment interest is uniquely tailored to address. Simply put, prejudgment interest is a different remedy for a different harm. Because prejudgment interest may be necessary at times to effectuate the legislative purpose of making copyright holders whole and removing incentives for copyright infringement, we hold that the district court erred in concluding that prejudgment interest is unavailable under the Copyright Act of 1976, and we remand for further consideration.

## C. ATTORNEY'S FEES

The remaining copyright issue concerns a claim brought under the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.,* which governs copyright

management information, such as the copyright notice or ownership information. The district court excluded from the pretrial order Polar Bear's claim for willful removal of its copyright, brought under § 1202, because it was not referenced in any previous pleadings. According to the district court, allowing the claim would result in "manifest injustice." We review for abuse of discretion the district court's exercise of its authority under Federal Rule of Civil Procedure 16 to modify a pretrial order. *See Byrd v. Guess,* 137 F.3d 1126, 1131 (9th Cir.1998). "The district court is given broad discretion in supervising the pre-trial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order will not be disturbed unless they evidence a clear abuse of discretion." *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607 (9th Cir.1992) (internal quotation marks and alterations omitted).

 Generally, the inclusion of a claim in the pretrial order provides sufficient notice to parties that the parties intend to litigate the issue. In this case, however, we cannot say the district court abused its discretion in precluding the copyright management information claim. Neither Polar Bear's original nor amended complaint mentioned a copyright management information claim, and Polar Bear even failed to raise the claim in its proposed second amended complaint. In fact, Polar Bear never requested leave to amend its complaint to include either a § 1202 claim or a request for attorney's fees under § 1203. Rather, the first time these claims appeared was in the pretrial order. Polar Bear's pleadings and its pretrial arguments did not provide notice of a § 1202 claim because their entire thrust related only to allegations of copyright infringement, whereas § 1202 deals with the removal of copyright information, an altogether different violation. Under these circumstances, the district court did not abuse its discretion in concluding that Polar Bear's last ditch attempt to include a claim for attorney's fees under § 1203 lacked candor and should be rebuffed.[15]

### III. STATE TRADEMARK CLAIM

 Lastly, Polar Bear asks us to consider whether the district court improperly applied a two-year statute of limitations barring its state law trademark infringement claim. Polar Bear argues that this point is not insignificant as the state claim would permit it to seek punitive damages. Without comment as to the scope or viability of Polar Bear's trademark claim, we conclude that Montana's three-year statute of limitations for general tort claims should apply to claims brought under the state trademark statute instead of the two-year limit for actions based on fraud.[16] Consequently, we re-

---

**15.** It also bears noting that the preclusion of this claim is of minor monetary significance to Polar Bear. Polar Bear states that its purpose in challenging the elimination of its § 1202 claim is so that it can in turn seek attorney's fees under § 1203 of the Act. Attorney's fees recoverable under § 1203 are limited to fees incurred in civil actions for violations of § 1202, not for claims of copyright infringement under § 504(b). *See* 17 U.S.C. § 1203. Because Polar Bear never articulated a § 1202 claim-only a § 504(b) claim-precluding the recovery of fees under § 1202 was of minimal significance.

**16.** Polar Bear asserts that it also pleaded a claim for unfair trade practices under Montana common law. Statutory unfair trade practice claims are barred by the two-year statute of limitations applicable to actions based on fraud and for liability created by statute. *See Osterman v. Sears, Roebuck & Co.,* 318 Mont. 342, 80 P.3d 435, 441–42 (2003). Because the two-year limit for fraud also applies to the common law analogue, the district court properly granted summary judg-

mand so that Polar Bear may proceed with its trademark claim under Montana law.

The Montana trademark law does not specify a statute of limitations. *See* Mont. Code Ann. § 30–13–303 *et seq.* In determining the applicable statute of limitations, we begin our analysis with the observation that trademark infringement generally sounds in tort. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir. 1998) (noting that trademark infringement is "akin to a tort case" -for purposes of determining jurisdiction); *Int'l Order of Job's Daughters v. Lindeburg and Co.,* 633 F.2d 912, 915 (9th Cir.1980) (describing trademark infringement as part of a general commercial tort of unfair competition); *see also Two Pesos v. Taco Cabana, Inc.,* 505 U.S. 763, 785, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (J. Thomas, concurring) (the Lanham Act "codified, among other things, the . . . common-law tort[ ] of technical trademark infringement").

In Montana, tort actions are governed by a three-year statute of limitations, unless a more specific statute of limitations controls. Mont.Code Ann. § 27–2–204; *see also Powder River County v. State,* 312 Mont. 198, 60 P.3d 357, 371–72 (2002). Examples of these specific statutes of limitations include actions for childhood sexual abuse, slander or libel, assault and battery, as well as torts for medical and legal malpractice. No specific statute is within the ballpark—or, in this case, time zone—of a claim of trademark infringement. And, even if there were a colorable argument that other time limits apply, such as those for fraud or injury to property, the Montana Supreme Court has made clear that "[w]here there is a substantial question as to which of two or more statutes of limitations should apply, the general rule is that the doubt should be resolved in favor of the statute containing the longest limitations." *Ritland v. Rowe,* 260 Mont. 453, 861 P.2d 175, 178 (1993). Absent any contrary indication from the Montana Supreme Court that a more specific statute of limitations applies to claims brought under Montana trademark law, we elect to apply the three-year statute of limitations to Polar Bear's claim.[17]

We are not persuaded by Timex's three alternative arguments in favor of rejecting Polar Bear's trademark claims. First, Timex urges the application of the two-year limit for actions involving liability created by statute. However, under Montana law, the phrase "liability created by statute" does not include rights that existed in the common law but were later codified. *See Royal Ins. Co. v. Roadarmel,* 301 Mont.

---

ment to Timex on the unfair trade practices claims.

**17.** The district court granted summary judgment to Timex on Polar Bear's related trademark claims under § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a). Because the Lanham Act contains no explicit statute of limitations, the district court attempted to look to the most closely analogous action under state law, as required by our precedent. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 836 (9th Cir.2002). Observing that "the Federal Courts have consistently borrowed a state statute of limitations for fraud as the applicable act . . .", the district court applied Montana's two-year statute of limitations for actions in fraud and barred Polar Bear's Lanham Act claims. The district court then applied, for the sake of consistency, the same two-year limit to Polar Bear's state trademark law claims. This reasoning puts the cart before the horse. It is beside the point that federal courts often apply the statute of limitations for fraud in evaluating a laches defense for actions brought under the Lanham Act. Determining which state statute is most analogous depends on the state in question. In the case of Montana, the law most analogous to federal trademark law is the Montana trademark law. Polar Bear does not appeal the district court's grant of summary judgment on its Lanham Act claim, and therefore this question is not before us.

508, 11 P.3d 105, 108–09 (2000). The cause of action for trademark infringement existed at common law, *see Truzzolino Food Prods. Co. v. F.W. Woolworth Co.*, 108 Mont. 408, 91 P.2d 415, 415–16 (Mont.1939) *overruled on other grounds by Fauver v. Wilkoske*, 123 Mont. 228, 211 P.2d 420, 426 (1949), and thus, Timex's argument is without merit. Timex's argument is also foreclosed by the Montana trademark statute itself, which expressly states that the statute does not affect the rights held under the common law. Mont.Code Ann. § 30-13-336.

Nor is there support for Timex's argument that Polar Bear's trademark claims are preempted by the Copyright Act. Copyright and trademark are related but distinct property rights, evidenced by different federal statutes governing their protection. *Compare* Copyright Act, 17 U.S.C. § 101 *et seq. with* the Lanham Act, 15 U.S.C. § 1125; *see also Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 595 (9th Cir.2000) (recognizing different protections under copyright and trademark). The Copyright Act does not preempt related state laws if the state laws "protect rights which are qualitatively different from copyright rights...." *Valente–Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir.1989) (internal quotation marks and alterations omitted).

Equally unconvincing is Timex's argument that Polar Bear failed to state a claim under Montana trademark law.[18] Polar Bear has yet to present its case as to whether PaddleQuest is a protectable recognizable trademark and whether Timex

infringed the mark. We decline Timex's invitation to decide the issue before presented with a district court ruling. Thus, Polar Bear may proceed with its state law trademark claim.

### IV. CONCLUSION

We remand the actual damages award with instructions for the district court to remit the amount related to lost profits. The damages award for Timex's profits is vacated as speculative. On this record, Polar Bear is not entitled to any recovery under 17 U.S.C. § 504, nor is Polar Bear entitled to a new trial on damages under § 504. We reverse the district court's determination that pre-judgment interest is unavailable under the Copyright Act of 1976 and remand for reconsideration consistent with this opinion. We reverse the district court's dismissal of Polar Bear's state law trademark infringement claim. We affirm the district court on the remaining issues.

**AFFIRMED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs on appeal.**

---

18. Although there is a general bar to double recovery, we caution that damages arising from a copyright violation do not necessarily overlap wholly with damages from a trademark violation, even though there might be only one underlying action. For example, in *Nintendo of America, Inc. v. Dragon Pacific International*, 40 F.3d 1007, 1011 (9th Cir. 1994), we upheld an award for both statutory damage under the Copyright Act and actual damages under the Lanham Act, stating that the violation "may have been one act, but it was two wrongs," and that "it is clear enough that, when a defendant violates both the Copyright Act and the Lanham Act, an award of both types of damages is appropriate."