In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2736

FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for
PARK NATIONAL BANK,

*Plaintiff-Appellee,*

*v.*

RLI INSURANCE COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 3790 — **Milton I. Shadur**, *Judge.*

ARGUED JANUARY 23, 2015 — DECIDED APRIL 30, 2015

Before WOOD, *Chief Judge*, and KANNE and TINDER, *Circuit Judges*.

WOOD, *Chief Judge*. In 2001, representatives from the Moody Bible Institute of Chicago and a company called Sysix Financial signed a master lease agreement. The document laid the groundwork for future leases of equipment from Sysix to Moody. Seven years later, in 2008, two lease schedules for various computer items were executed; they

appeared to have been signed by Moody's vice president and Sysix's president. Sysix assigned its end of both leases to another company, Rockwell Financial Group, which in turn acquired loans from Park National Bank (PNB) to finance the two individual leases between Sysix and Moody. PNB procured indemnification coverage for its loans to Rockwell from RLI Insurance Company in the form of a financial institution bond. There was, however, a problem at the heart of these transactions: Sysix's president had forged the signature of Moody's vice president on each of the two lease schedules. Moody never agreed to either schedule nor did it ever receive any of the promised equipment.

PNB notified RLI of its potential loss under the bond RLI had issued, but PNB itself soon went under. Acting as receiver for PNB, the Federal Deposit Insurance Corporation (FDIC) sued RLI in federal court, arguing that the language of the bond obligated RLI to indemnify PNB (and thus FDIC) for its losses related to the forgeries on the lease schedules. Eventually the district court granted summary judgment in FDIC's favor. Because we agree with the district court that the plain language of the bond covered FDIC's losses, we affirm.

**I**

This series of transactions began when Robert Gunter, vice president and general counsel of Moody, and John Sheaffer, president of Sysix, signed a document entitled "Master Equipment Lease Agreement" in December 2001. The master lease referred to future lease schedules that the parties would execute "from time to time," and stated that each lease schedule "shall constitute a separately enforceable lease … for the Equipment therein."

In March 2008, Moody and Sysix purportedly executed a lease schedule (Lease Schedule S080), which bore the signatures of Sheaffer and Gunter. The minimum term of the lease was 48 months beginning April 1, 2008, with a monthly rent of $72,691.73 for hundreds of pieces of computer equipment listed in an attached exhibit. Schedule S080 stated that the total monthly rent was for equipment, the total purchase price of which was not to exceed $2,977,135.49. It also noted that it incorporated the terms and conditions of the 2001 master lease. The two men supposedly executed a similar lease schedule that same year, in December 2008, again for a large batch of computer equipment (Lease Schedule S084). The monthly rent for Schedule S084 was $32,410.51, with the purchase price of the described equipment not to exceed $1,111,024. Like Schedule S080, Schedule S084 incorporated the terms of the master lease between Moody and Sysix. But like Schedule S080, Schedule S084 was a forgery. Sheaffer signed Gunter's name to both schedules and created the terms of each out of whole cloth. Sheaffer admitted as much in a letter in December 2008, where he wrote, "The Moody Bible Institute has no idea and never excueted [*sic*] schedule 80 0r [*sic*] 84 and for that matter Rockwell Financial is complete un asare [*sic*] that I compeltly [*sic*] fabricated these deals." It appears from the record that Rockwell and Moody discovered the forgeries around July 2009; Sheaffer committed suicide that month.

In 2008, before Sheaffer's forgeries were discovered, Sysix assigned all of its rights in both lease schedules to Rockwell. After each assignment, Rockwell sought loans from PNB to cover its end of the deal. A PNB loan presentation document, dated March 7, 2008, indicates that Rockwell initially sought $3.1 million from PNB; this sum was associated with Sched-

ule S080, which was executed less than two weeks later. Another PNB loan presentation document dated December 10, 2008, shows Rockwell seeking $1.12 million, presumably associated with Schedule S084, which was executed just a few days after the presentation. A few weeks after each loan presentation, Rockwell and PNB signed a document called "Assignment and Security Agreement." This document specifically referred to both the lease schedule in question and a separate promissory note Rockwell had executed for a specific amount. These amounts were slightly different from those on the loan presentations. For Schedule S080, Rockwell's promissory note was for $2,978,334.28, with monthly installments of $72,691.73. (Recall that the maximum purchase amount for Schedule S080 was $2,977,135.49, with a monthly amount due of $72,691.73.) For Schedule S084, Rockwell's promissory note was for $1,131,989.75, with a $32,410.51 monthly payment (compared to $1,111,024 on Schedule S084, which had the same monthly amount of $32,410.51).

In May 2009, PNB acquired a bond from RLI to cover potential losses flowing from its loans to Rockwell during the period from May 1, 2009 to May 1, 2010. Of particular interest here, the bond's Insuring Agreement E stated that RLI agreed to indemnify PNB for

> [l]oss resulting directly from the Insured having, in good faith, for its own account or for the account of others, … acquired, sold or delivered or given value, extended credit or assumed liability, on the faith of, any Written, Original … Security Agreement, which (i) bears a handwritten signature of any maker,

> drawer, issuer, endorser, assignor, lessee, trans-
> fer agent, registrar, acceptor, surety, guarantor,
> or of any other person whose signature is ma-
> terial to the validity or enforceability of the se-
> curity, which is a Forgery, or (ii) is altered, or
> (iii) is lost or stolen … .

Agreement E also stated that "[a]ctual physical possession of
the items listed … by the Insured, its correspondent bank or
other authorized representative, is a condition precedent to
the Insured's having relied on the faith of such items." A few
other provisions of the bond concern us as well. The bond
defines a "Security Agreement" as "a Written agreement
which creates an interest in personal property or fixtures
and which secures payment or performance of an obliga-
tion." "Original" documents, it says, are "the first rendering
or archetype." It also specifies time limits on lawsuits: they
"shall not be brought prior to the expiration of 60 days after
the original proof of loss is filed with the Underwriter or af-
ter the expiration of 24 months from the discovery of such
loss." Finally, the bond contains what it terms an "anti-
bundling" provision: it states that for documents containing
forgeries, "the alteration or counterfeit or signature must be
on or of the enumerated document itself not on or of some
other document submitted with, accompanying or incorpo-
rated by reference into the enumerated document."

At some point in August 2009, PNB demanded that
Moody and Rockwell submit payments on Schedules S080
and S084. No money came, and so PNB sued them for non-
payment in September 2009. A month later, PNB gave RLI
notice that it had discovered a potential loss covered by the
bond. By the end of October, however, PNB had failed. The

Office of the Comptroller of the Currency closed PNB and named FDIC as PNB's receiver. At the same time, FDIC entered a purchase agreement with U.S. Bank National Association, under which U.S. Bank bought PNB's assets and assumed its liabilities. Under the purchase agreement, FDIC paid U.S. Bank for 80% of PNB's losses under the two lease schedules, and U.S. Bank absorbed the remaining 20%; U.S. Bank also settled PNB's original lawsuit against Rockwell. FDIC determined that it was left with losses of $2,103,365. It filed a claim for that amount with RLI in June 2010, but RLI denied the claim in November 2010.

Believing that RLI's denial violated the terms of the bond RLI had issued to PNB, FDIC filed a breach-of-contract claim against RLI in May 2012. The district court had subject-matter jurisdiction over the suit under 12 U.S.C. § 1819(b)(2)(A), which provides that civil suits to which FDIC is a party arise under the laws of the United States. In June 2014 it resolved the suit with a grant of summary judgment for FDIC.

## II

RLI offers five reasons why, in its view, the bond it issued to PNB does not cover FDIC's loss. We will address each in turn.

## A

The bond covers losses resulting directly from PNB's reliance on a document that bears a forged signature. It gives several examples of documents that qualify for coverage, including security agreements, which as we have noted must be in writing and must create "an interest" in property to secure payment or performance of an obligation. RLI con-

tends that the lease schedules at issue in this case do not fit that description and thus do not warrant RLI's coverage of FDIC's losses. (No one asserts that the lease schedules are properly classified as any of the other documents qualifying for coverage under the bond.)

As RLI sees it, the lease schedules did not create an interest in any property. Instead, they merely reflected Sysix's existing interest in the computer equipment and memorialized Moody's obligation to make payments. Moody had no obligation to buy the equipment, RLI says, and thus the schedules could not convey title to anyone. The problem with this argument is that the bond does not specify what sort of "interest" had to have been retained in the property in order for the lease to qualify as a security agreement. The word "interest" does not, contrary to RLI's assumption, describe only an ownership interest. The lease schedules here conveyed something less than full ownership: a *possessory* interest in the computer equipment that Sysix was supposedly leasing to Moody. In keeping with that conveyance, the schedules anticipate Moody's taking possession of the listed computer equipment. PNB reasonably viewed this language as creating an enforceable interest for Moody in the listed property. The language of the bond requires nothing more.

RLI pushes back with several cases that consider whether certain documents could be considered security agreements for purposes of the Uniform Commercial Code. Section 9-102 of the UCC defines "security agreement" as "an agreement that creates or provides for a security interest"—that is, an interest sufficient to permit the secured party to look to that property for repayment. The idea is similar to the one reflected in the bond, but RLI has provided no reason why the

UCC taken as a whole should dictate the result here. As the district court noted, the bond and the UCC employ the terms "lease" and "security agreement" for different reasons and in different contexts. We need not wade into the discussions about, for example, the differences for UCC purposes between true leases and installment sales contracts. The plain language of the bond requires only that "*an* interest" in property be conveyed through a document in order for it to be a security agreement. Nothing in the UCC undermines that language.

RLI also argues briefly that PNB did not "treat" the lease schedules as security agreements, but it fails to explain why that is relevant to the language of the bond. We agree with FDIC that the interest conveyed in the lease schedules is sufficient to treat those lease schedules as security agreements under the bond and thus as something that entitles FDIC to indemnification coverage for its losses.

B

RLI also argues that FDIC has not shown that its loss resulted directly from a forgery. If that were true, it would be a problem, because the bond requires (as RLI puts it) "a direct nexus between the forgery and the loss" in order to trigger coverage. More precisely, the bond promises indemnification for "[l]oss resulting directly from the Insured having, in good faith, … assumed liability, on the faith of, any Written, Original … Security Agreement, which … bears a handwritten signature … which is a forgery." RLI contends that the forged signatures on the lease schedules did not directly cause PNB's loss, because the computer equipment described in each schedule did not exist, and so there was nothing for Sysix to lease to Moody in the first place. There-

fore, even if the signature had been genuine, RLI says, the underlying "collateral" would have been worthless. It concludes that in this situation the real source of the loss would be worthless collateral, not forgery, and thus the loss would not be covered by the bond.

RLI's reading of the bond overlooks a critical detail. The bond does not say that the loss must have resulted directly from a forgery; it says that the loss must have resulted directly from reliance upon a security agreement that *contained* a forgery. Contrary to RLI's contention, the bond does not require FDIC to show that the forged signature by itself harmed PNB's ability to recoup its loss. If PNB relied in good faith on the lease schedules to disburse funds to Rockwell, and the lease schedules contained both the forged signatures and the lists of fictitious equipment, FDIC can show that its loss satisfies the terms of the bond.

Relying primarily on district court and some unpublished cases from outside this circuit, RLI urges us to find an exception for coverage based on the "fictitious-collateral" doctrine. These cases take the position that RLI advances, namely, that a bank's loss for purposes of a bond such as this must flow from the forgery itself. That condition cannot be met if the underlying collateral is worthless or non-existent. This court, however, has expressed doubt about a "fictitious-collateral doctrine," albeit in a case dealing with slightly different bond language from that at issue here. See *First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 980 (7th Cir. 2007) (rejecting as "scantily reasoned" a state court case concluding that bond language "does not cover losses resulting from the nonexistence of assets assigned by a forged instrument"). RLI also urges us to

adopt a "stringent" loss-causation standard different from the one discussed in *First National Bank of Manitowoc*.

Our primary reason for rejecting RLI's argument is straightforward: we are bound by the plain language of the bond, and this bond does not make coverage dependent on the quality of the collateral. It requires only a document bearing a forged signature, and good-faith reliance on that document that caused the bank's loss. For similar reasons, RLI's argument about loss causation is misplaced.

Furthermore, the district court offered an additional reason, to which RLI has not adequately responded, for its refusal to accept RLI's fictitious-collateral argument. The court observed that the lease schedules were more than a simple description of (fictitious) collateral; they were themselves collateral that induced the transactions between PNB and Rockwell. The district court's rationale reflects the way that transactions like this one actually operate: the signed document itself serves as the basis for the transaction. The same is true, for example, in futures markets, where contracts for commodities, not the underlying commodities, are the items of value. As the district court did, we conclude that FDIC's loss resulted directly from PNB's reliance on the lease schedules, each of which contained a forgery and each of which was in itself an item of value to the bank.

## C

Reliance is the next issue we must consider. RLI argues that PNB did not "extend[ ] credit or assume[ ] liability, on the faith of" the lease schedules, as the bond requires. In reality, RLI continues, PNB approved Rockwell's loan applications before it ever saw the lease schedules, and there is no

evidence that anyone at PNB who approved the loans made any decisions based upon their contents. Thus, RLI concludes, PNB cannot have extended credit to Rockwell "on the faith of" those documents, which were the only ones with forged signatures.

In this instance, RLI oversimplifies. PNB did possess the lease schedules before it executed (on the same day) a security agreement with Rockwell and Rockwell signed a promissory note. Both events preceded PNB's disbursement of funds to Rockwell. This raises the question: at what point did PNB actually "extend[ ] credit … on the faith of" the lease schedules? RLI proposes that the operative decision on PNB's part was the moment at which it gave *preliminary* approval to the loans for Rockwell. That makes little sense, however, given the fact that more needed to happen before money changed hands. Only after PNB took those other steps did it finally disburse the funds.

The loan presentations that preceded each of PNB's two loans to Rockwell are in the record, along with the other documents we discuss here. The first presentation is dated March 7, 2008. It preceded the execution of Lease Schedule S080 by about two weeks and shows that Rockwell requested $3,100,000. Schedule S080 itself, purportedly executed on March 20, bears the figure of $2,977,135.49 as the original equipment cost, and shows a monthly rent of $72,691.73. Eight days later, Rockwell executed a promissory note for a total amount of $2,978,334.28, with monthly installments of $72,691.73 (precisely what Schedule S080 called for). The same day, PNB executed an assignment and security agreement regarding PNB's loan to Rockwell. The agreement refers to Schedule S080 by its date and name as the "related

contract" and reflects the same $2,978,334.28 amount, over $120,000 less than the amount proposed in the loan presentation. PNB's second loan to Rockwell in December 2008 followed the same pattern. The initial loan presentation on December 10, 2008, indicated that PNB would loan $1,120,000 to Rockwell. Lease Schedule S084, executed on December 15 and 16, was close but not identical: it reflected an equipment purchase price of $1,111,024, with a monthly rent of $32,410.51. Rockwell's December 22 promissory note included a monthly payment amount of $32,410.51, and the security agreement it signed with PNB that same day made specific reference to Schedule S084. (The total amount for the second loan was $1,131,989.75; neither party explains why it was higher than both the loan presentation and the amount on Schedule S084.)

These documents support the conclusion that the operative moment was when PNB actually disbursed the money, not when it initially approved the loans—in other words, when the money went out the door. That moment did not arrive until PNB had in its possession the two lease schedules that contained the forged signatures. There is little question that PNB consulted those schedules before coming to final agreement with Rockwell, given the specific references to the lease schedules and the agreements' use of the precise monthly rental amounts from the schedules. RLI contends that a reasonable juror could find that PNB did not rely on the lease schedules, but we cannot see how on this record. The only plausible conclusion is that PNB ultimately "extended credit … on the faith of" documents bearing forgeries (the lease schedules).

FDIC also points to testimony from PNB's senior vice president, Richard Dunbar, as evidence that PNB relied on the lease schedules. Dunbar testified in a deposition that PNB "had the original of [the lease schedules] prior to funding these loan transactions," because PNB "always require[d] those originals," and that PNB "rel[ied] in good faith" on the lease schedules when making its loans to Rockwell. RLI disparages this testimony, pointing out that people other than Dunbar approved the loans at the loan presentation stage. This suggests, RLI argues, that Dunbar lacked personal knowledge of the decisions to make the loans. But Dunbar was PNB's signatory to the final security agreements and assignments between Rockwell and PNB. Those documents reflected the monthly amounts from the lease schedules and referred to the schedules by date and name. That is enough to show that Dunbar played some role in the disbursement of the funds to Rockwell.

In sum, RLI has not pointed to enough to permit a reasonable jury to find that PNB did not provide loans to Rockwell on the faith of documents containing forged signatures. To the contrary, the undisputed material facts demonstrate that PNB possessed and reviewed the lease schedules as it came to a final arrangement with Rockwell, and it explicitly referred to the schedules and incorporated their monthly payment terms in the final loan documents.

D

RLI's next argument is that FDIC failed to comply with the requirement in the bond requiring it to have actual physical possession of the forged document. RLI interprets this to mean actual possession of the original 2001 master lease. It is undisputed that FDIC never possessed that document. Ergo,

RLI says, FDIC cannot show that it assumed liability "on the faith of … any Written, Original" security agreement containing a signature "which is a Forgery," where "Original" is defined as "the first rendering or archetype."

RLI is again not taking the bond's language in context. The bond does not require the insured party to possess the original of every document associated with a transaction, including a master loan document that preceded an individual lease agreement. We can assume that the master lease began the business relationship between Moody and Sysix, but each lease schedule represents a standalone transaction, each with its own execution date and financing. It is undisputed that FDIC possesses the original of each lease schedule. As we already have discussed, each lease schedule is a security agreement as defined by the bond, and each contains a forgery upon which PNB (and FDIC by extension) sufficiently relied to trigger coverage. In short, FDIC possesses the written originals of the operative security agreements—here, the lease schedules.

RLI suggests that because (as it sees it) the lease schedules "contain no material terms" and "are simply lists of leased equipment," they do not qualify as agreements. A look at the schedules, however, shows that they are not so limited. In particular, the first page of each schedule provides the material terms: the minimum term of the lease, the commencement date, the monthly rent, the maximum purchase price of the leased equipment, and an automatic renewal provision in the event that the lessee fails to return the equipment upon termination of the lease. Although the leases also incorporate the master lease by reference, RLI contends that this must be disregarded because of the "anti-

bundling" provision within the bond. We need not address this argument because in our view the incorporation of the master lease does not change anything, given the lease schedules' status as the operative forgery-bearing security agreements in this case.

E

Finally, RLI contends that FDIC's claim falls outside the bond's contractual statute of limitations. PNB discovered its loss in September 2009, yet FDIC did not file suit against RLI until May 2012. The bond contains a provision imposing a 24-month limit on the initiation of litigation, measured from the date of discovery of the insured's loss; RLI argues that this controls. We can dispense with this argument easily. The Financial Institutions Reform Recovery and Enforcement Act (FIRREA), enacted in 1989 (long before these transactions), says that "[n]otwithstanding any provision of any contract," the statute of limitations for any contract claim brought by FDIC is the longer of six years or the applicable state statute of limitations. 12 U.S.C. § 1821(d)(14); Pub. L. No. 101-73, § 212 (1989). The present case involves a contract claim brought by FDIC in its capacity as receiver. RLI concedes that if the FIRREA period applies, this suit was timely.

RLI fights this outcome with a convoluted argument that starts with the proposition that the 24-month limitation on suits in the bond is not analogous to a statute of limitations. If that is so, then (RLI contends), the period in the bond overrides FIRREA's six-year (or greater) allowance for this kind of suit by FDIC because it is a contractual provision, and contractual provisions are favored by Illinois law when contrary to statutes of limitations. Its argument, however, utterly ignores the fact that FIRREA's period applies

"[n]otwithstanding any provision of any contract." The statutory language could not be clearer. Congress provided that FIRREA would override shorter contractual time limits, not the other way around.

RLI's only response is to argue that the language in FIRREA is merely a choice-of-law provision, not the firm command we perceive it to be. RLI does not explain this argument aside from a citation to our decision in *FDIC v. Wabick*, 335 F.3d 620 (7th Cir. 2003), which does not deal with the "notwithstanding" language. *Wabick* addressed the language in FIRREA instructing courts to use "the longer of" either six years or the applicable state statute of limitations (which was 10 years in Illinois). The statutory language here unequivocally instructs courts to set aside "any provision of any contract." RLI also points to *CTS Corp. v. Waldburger*, 134 S. Ct. 2175 (2014), stating that the Supreme Court "recently addressed this issue" in that case. The issue to which RLI refers, however, is just the general distinction between statutes of limitation and statutes of repose. *Waldburger* examined an environmental statute, not FIRREA. The question was whether that statute preempted only statutes of limitations, or also statutes of repose. Nothing in *Waldburger* casts any doubt on our reading of FIRREA.

## III

The bond that RLI issued to PNB covers the loss that PNB (and thus FDIC as receiver) suffered in this case. Because FIRREA specifically overrides conflicting contractual periods for bringing suit, and FDIC sued within the statutory time, its claim was not subject to dismissal as untimely. We therefore AFFIRM the judgment of the district court in favor of FDIC.